# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
### LAREDO DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| V. | § | CRIMINAL NO. 5:22-1439 |
| | § | |
| MARSHALL STEVE MERRIMAN | § | |

## GOVERNMENT'S SUPPLEMENTAL RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

Defendant Marshall Steve Merriman was arrested at the Hebbronville Border Patrol checkpoint on October 25, 2022, after he informed the checkpoint officers he was in possession of marijuana and a firearm, which turned out to be a loaded Sig Sauer model P224, .357 caliber handgun from which the manufacturer's serial number had been obliterated (D.E. 4). A criminal history check revealed Merriman had multiple prior arrests and two outstanding warrants: (1) for aggravated assault with a weapon, felony second class, out of the Fort Worth Sheriff's Office; and (2) for resisting an officer, Class A misdemeanor, out of the Cleburne, Texas, Sheriff's Office (D.E. 4). Merriman admitted he knew the firearm's serial number had been polished off and explained that law enforcement officers previously had seized all his firearms from his home after he fired several rounds at his girlfriend's vehicle as she was driving away from the residence (D.E. 4). Merriman said he did not believe he could legally purchase a firearm because of that charge and that he had acquired the gun from a friend (D.E. 4).

Merriman was charged by indictment on November 15, 2022, with one count of knowingly possessing a firearm from which the manufacturer's serial number had been removed, altered and obliterated, in violation of 18 U.S.C. § 922(k) (D.E. 12). He moved to dismiss the indictment, arguing that § 922(k) is unconstitutional based on the Supreme Court's recent decision in *New York State Rifle & Pistol Assoc., Inc. v. Bruen*, 142 S. Ct. 2111 (2022) (D.E. 18). The United States

filed its response in opposition (D.E. 22).

Two weeks later, the Fifth Circuit issued *United States v. Rahimi*, 59 F.4th 163 (5th Cir. Feb. 2, 2023), *withdrawn and superseded by United States v. Rahimi*, 61 F.4th 443, ___, 2023 WL 2317796, *1 (5th Cir. Mar. 2, 2023), *pet. for certiorari filed* (No. 22-219) (Mar. 21, 2023), which found unconstitutional 18 U.S.C. § 922(g)(8)'s prohibition on firearm possession while subject to a domestic violence restraining order.  This Court has now requested supplemental briefing by the parties addressing *Rahimi*'s effect, specifically:  (1) "whether the Second Amendment's 'plain text' covers Defendant's conduct"; and (2) "whether the type of firearm Defendant possessed is 'in common use,' such that it falls within the Second Amendment's scope" (D.E. 26).  "Assuming Defendant's conduct falls within the Second Amendment's scope," the Court has instructed the parties to "frame their historical arguments under *Rahimi*'s 'how' and 'why' framework:  '[The Government must show] *how* the challenged law burdens the right to armed self-defense, and *why* the law burdens that right.'" (D.E. 26) (emphasis in original).  The United States now files its supplemental response, which is intended to augment (not replace) its initial response.

*Rahimi* does not change the outcome here; Merriman's challenge should still be rejected. First, § 922(k) is facially consistent with the Second Amendment under the logic of both *Bruen* and *Rahimi*.  Neither case casts any doubt on laws imposing conditions and qualifications on the commercial sale of arms, including a prohibition of the obliteration of serial numbers. Even if § 922(k) did regulate protected conduct, it would still be constitutional because it is consistent with the nation's historical tradition of firearms regulation.  Accordingly, Merriman's motion to dismiss the indictment should be denied.

I.      **THE SECOND AMENDMENT, *EMERSON*, *HELLER* AND *BRUEN***

The Second Amendment to the Constitution provides that "[a] well-regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed."   U.S. CONST. AMEND. II.   The Fifth Circuit has long recognized that the Second Amendment protects an individual's (not just a militia member's) right to keep and bear arms.   *See United States v. Emerson*, 270 F.3d 203, 260-61 (5th Cir. 2001), which held that the Second Amendment right is not unlimited, but rather subject to restrictions consistent with the right "as historically understood in this country."   Specifically, "it is clear that felons, infants and those of unsound mind may be prohibited from possessing firearms."   *Id*.   The Fifth Circuit characterized the right to possess firearms as a common law right preceding the Constitution, which the Framers understood to exclude certain groups.   *Id*. at 226 n.21.

In *District of Columbia v. Heller*, 554 U.S. 570, 635 (2008), the Supreme Court struck down a District of Columbia law that banned the possession of handguns in the home.   The Court arrived at the same conclusion as the Fifth Circuit had in *Emerson* and recognized that the Second and Fourteenth Amendments protect the right of all law-abiding, responsible citizens—not just militia members—to possess a handgun in the home for lawful purposes like self-defense.   *Id*. Like *Emerson*, *Heller* emphasized that "the right secured by the Second Amendment is not unlimited."   *Id.* at 626.   *Heller* made clear that the opinion should not "be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms."   *Id.* at 626–27. *Heller* described these regulations as "presumptively lawful" measures.   *Id.* at 627 n.26.

In *Bruen*, the Court parsed a New York state regulation requiring a person to show

3

"proper cause" to obtain a license to carry a firearm outside the home.  *Bruen*, 142 S. Ct. at 2117, 2122, 2125.  To satisfy that requirement, the applicant had to "demonstrate a special need for self-protection distinguishable from that of the general community."  *Id*. at 2117, 2123.  The Court held that this "proper cause" requirement violated the Second Amendment.  *Id.* at 2117.

In doing so, the Court rejected the "'two-step' framework for analyzing Second Amendment challenges that combines history with means-end scrutiny" that had been developed by the Courts of Appeals after *Heller*.  *Id*. at 2117.  In step one, "the government may justify its regulation by establishing that the challenged law regulates activity falling outside the scope of the right as originally understood."  *Id.* at 2126 (punctuation omitted).  The original scope of the right is based on its historical meaning.  *Id.*  If the government could prove that the regulated conduct falls beyond the Amendment's original scope, then the analysis stopped there; the regulated activity is categorically unprotected.  *Id*.  In step two, the Courts analyzed "how close the law comes to the core of the Second Amendment right and the severity of the law's burden on that right."  *Id.*  The core Second Amendment right is generally limited to self-defense in the home.  *Id*.  If a "core" Second Amendment right is burdened, courts applied "strict scrutiny" and asked whether the Government can prove the law is "narrowly tailored to achieve a compelling governmental interest."  *Id*.  Otherwise, they applied intermediate scrutiny and considered whether the Government could show the regulation was "substantially related to the achievement of an important governmental interest."  *Id.*

The Court rejected this two-part approach as "having one step too many."  *Id.* at 2117, 2127.  It held that step one was "broadly consistent with *Helle*r, which demands a test rooted in

the Second Amendment's text, as informed by history." *Id*. at 2127. "But *Heller* and *McDonald*[1] do not support applying means-end scrutiny in the Second Amendment context. Instead, the government must affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Id.* The Court noted, however, that the Second Amendment "is neither a regulatory straitjacket nor a regulatory blank check." *Id.* at 2133. It is "not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Id.*

*Bruen* did not overturn *Heller*. Rather, the Court "made the constitutional standard endorsed in *Heller* more explicit." *Id.* at 2134. It elaborated on the test *Heller* set forth in determining whether firearm laws are constitutional by "assess[ing] whether modern firearms regulations are consistent with the Second Amendment's text and historical understanding." *Id.* at 2131.

To make this assessment, a court must engage in a two-prong analysis. First, it must determine whether "the Second Amendment's plain text covers an individual's conduct." *Id.* at 2126. If it does not, the analysis ends, and the government's regulation is valid. If the conduct at issue is covered by the Amendment's text, however, the government must "demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation." *Id.* at 2129–30. Only if a firearm regulation is consistent with historical tradition "may a court conclude that the individual's conduct falls outside the Second Amendment's 'unqualified command.'" *Id.* at 2130.

---

[1] *McDonald v. City of Chicago, Ill.*, 561 U.S. 742 (2010) (overturning two Illinois cities' ordinances effectively banning handgun possession in the home as unconstitutional because the Second Amendment right to keep and bear arms is fully applicable to the States by virtue of the Fourteenth Amendment).

In conducting this historical analysis, the government may demonstrate historical acceptance of a regulation by "analogy" to a similar regulation that existed in the Founding Era. *Id.* at 2132. In this way, the test in *Bruen* requires only a showing of a historical example that is "relevantly similar" to the current regulation; the government only has to provide evidence of a "representative historical *analogue*, not a historical *twin*." *Id.* at 2133 (emphasis in original).

Applying the revised standard, the Court held the "proper cause" standard of the New York law violated the Second Amendment. *Id.* at 2123. First, the Court held the Second Amendment's plain text covered the conduct at issue (carrying a firearm outside the home). *Id.* at 2134–35. In so deciding, the Court emphasized that the petitioners were "ordinary, law-abiding, adult citizens" who sought to carry handguns publicly for self-defense. *Id.* at 2134. This, the Court concluded, fell within "the right to keep and bear arms." *Id.*

The Court then surveyed historical data from "medieval to early modern England" through "the late-19th and early-20th centuries" to determine whether the licensing law squared with historical tradition. *Id.* at 2135–56. After a "long journey through the Anglo-American history of public carry, [the Court] conclude[d] that respondents ha[d] not met their burden to identify an American tradition justifying the State's proper-cause requirement." *Id.* at 2156. "Apart from a few late-19th-century outlier jurisdictions," the Court summarized, "American governments simply have not broadly prohibited the public carry of commonly used firearms for personal defense" or required a showing of special need for public carry. *Id.*

Thus, while *Bruen* rejected the means-end scrutiny framework most courts had relied upon to assess the constitutionality of gun regulations and found a New York state firearms regulation unconstitutional, *id.* at 2127, *Bruen* did not consider – much less invalidate – the federal statute prohibiting possession of a firearm with an obliterated serial number, 18 U.S.C. §

6

922(k).

## II.    *RAHIMI*[2]

In *Rahimi*, the Fifth Circuit analyzed a different statute:  18 U.S.C. § 922(g)(8), which criminalizes the possession of a firearm by a person who is subject to a civil restraining order prohibiting them from stalking, harassing or threatening an intimate partner or the partner's child, and using, attempting to use or threatening to use physical force against an intimate partner or their child.  *Rahimi,* 2023 WL 2317796 at *2.  Rahimi was subject to such an order when he went on a veritable shooting rampage in Arlington, Texas, over a period of several weeks.  *Id*. at *1.  Police officers executed a search warrant at his home and found a rifle and a pistol.  *Id*.  Rahimi admitted he possessed the guns and that he was subject to an agreed civil protective order issued by a Texas district court after Rahimi's "alleged assault of his ex-girlfriend."  *Id.*

Rahimi moved to dismiss his indictment on the ground that § 922(g)(8) is unconstitutional; after the district court denied that motion, he conditionally pleaded guilty and appealed.  *Id.* at *2.  The Fifth Circuit initially affirmed because Rahimi's claim was foreclosed by precedent but later withdrew that opinion after *Bruen.  Id*.

The Fifth Circuit ostensibly employed *Bruen*'s "two analytical steps:"

> First, courts must determine whether the Second Amendment's plain text covers an individual's conduct.  If so, then the Constitution presumptively protects that conduct, and the Government must justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation.  Only then may a court conclude that the individual's conduct falls outside the Second Amendment's unqualified command.

> To carry its burden, the Government must point to historical precedent from before, during, and even after the founding that evinces a comparable tradition of regulation.  We are not obliged to sift the historical materials for evidence to sustain the statute.  That is the Government's burden.

---

[2]  The United States has filed a petition for certiorari arguing that *Rahimi* was wrongly decided.  *See United States v. Rahimi* (No. 22-915) (Mar. 21, 2023).

The Government need not identify a historical twin; rather, a well-established and representative historical analogue suffices.  The Supreme Court distilled two metrics for courts to compare the Government's proffered analogues against the challenged law: *how* the challenged law burdens the right to armed self-defense, and *why* the law burdens that right.  Whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified are central considerations when engaging in an analogical inquiry.

*Id.* at *6. (citations and punctuation omitted).

The Fifth Circuit held that Rahimi's possession of a pistol and a rifle "easily falls within the purview of the Second Amendment" and it was "undisputed that the types of firearms that Rahimi possessed are in common use, such that they fall within the scope of the amendment." *Id.* at *7 (citations omitted).  In reaching this conclusion, the panel implicitly held that a person who is the subject of a domestic violence retaining order (an agreed order in Rahimi's case) is a "law-abiding citizen." *Id.* at *5-*7 (noting that Rahimi had not been criminally convicted or accused of any offense); *see also id.* at *14-*17 (Ho, J., concurring) (arguing that there was no historical analogue to § 922(g)(8) because it "disarms individuals based on civil protective orders – not criminal proceedings" and opining that "civil protective orders can help a party in a divorce proceeding").

"But Rahimi, like any other citizen, may have forfeited his Second Amendment rights if his conduct ran afoul of a lawful regulatory measure prohibiting the possession of firearms that is consistent with the historical tradition that delimits the outer bounds of the right to keep and bear arms.  The question turns on whether § 922(g)(8) falls within that historical tradition, or outside of it." *Id.* (citations and punctuation omitted).  The panel then examined "how" and "why" § 922(g)(8) "burdens a law-abiding citizen's right to armed self-defense." *Id.* (quoting *Bruen*, 142 S. Ct. at 2133).  "In particular, we focus on these key features of the statute:  (1) forfeiture of the right to possess weapons (2) after a civil proceeding (3) in which a court orders a protective order

based on a finding of a 'credible threat' to another specific person, or that includes a blanket prohibition on the use, or threatened use, of physical force, (4) in order to protect that person from 'domestic gun abuse.'" *Rahimi*, 2023 WL 2317796 at \*7.  "The first three aspects go to *how* the statute accomplishes its goal; the fourth is the statute's goal, the *why*." *Id.*  The Court rejected the Government's proffer of three "potential historical analogues," mainly because it found that § 922(g)(8) was not sufficiently similar to the historical analogues because it is aimed at protecting only a certain class of people (persons at risk of domestic gun abuse) rather than more generally protecting the nation's "political and social order" from the threat of "disloyal" or "unacceptable" groups.  *Id.* at \*8-\*11.  "As a result, § 922(g)(8) falls outside the class of firearm regulations countenanced by the Second Amendment." *Id.* at \*11-\*12.

## III.    SERIAL NUMBER REGULATIONS REMAIN CONSTITUTIONAL AFTER *BRUEN* AND *RAHIMI*

Section 922(k) prohibits "any person knowingly to transport, ship, or receive, in interstate or foreign commerce, any firearm which has had the importer's or manufacturer's serial number removed, obliterated, or altered or to possess or receive any firearm which has had the importer's or manufacturer's serial number removed, obliterated, or altered and has, at any time, been shipped or transported in interstate or foreign commerce." 18 U.S.C. § 922(k).  Violators face up to five years in prison.  18 U.S.C. § 924(a)(B).

Congress adopted § 922(k)'s precursor in the Federal Firearms Act of 1938, which made it unlawful "for any person to transport, ship, or knowingly receive in interstate or foreign commerce any firearm from which the manufacturer's serial number has been removed, obliterated, or altered."  *See* Pub. L. No. 75-785, § 2(i), 52 Stat. 1250, 1251.  Congress included an almost identical provision in the Omnibus Crime Control and Safe Streets Act of 1968, Pub. L. No. 90-351, § 902, 82 Stat. 197, 231.  It then added the prohibition on "possess[ing]" a firearm

9

with an obliterated serial number as part of the Crime Control Act of 1990. Pub. L. No. 101-647, § 2202(b), 104 Stat. 4789, 4856. By its terms, § 922(k) does not apply to firearms manufactured or imported without serial numbers before 1968, when Congress began to require serial numbers on all new and imported firearms. *See* Gun Control Act of 1968, Pub. L. No. 90-618, § 102, 82 Stat. 1213, 1223.

Section 922(k) reflects the common-sense understanding that intact serial numbers are a crucial component of regulating commercial gun sales and investigating gun crimes. Common sense further dictates that there is no "law abiding" reason to knowingly possess a firearm with an obliterated serial number. Rather, common reasons are (1) to commit criminal offenses with a firearm that is untraceable and therefore cannot be linked to the possessor or to other offenses involving that firearm; and (2) because the individual cannot legally purchase a firearm. *See* David M. Kennedy, et al., *Youth Violence in Boston: Gun Markets, Serious Youth Offenders, and a Use-Reduction Strategy*, 59 Law & Contemp. Probs. 147, 174-75 (Winter 1996) (observing that the only reason to obliterate a serial number is to avoid being connected with a firearm that was stolen, involved in a crime, or obtained in a straw purchase). Indeed, this second reason appears to have been Merriman's motive; he told the checkpoint officers that he did not believe he could legally purchase a firearm because he was subject to an aggravated assault with a deadly weapon charge after he fired a gun at his girlfriend. *See* D.E. 4 (Complaint).

A. **Merriman's conduct—knowingly possessing a firearm with an obliterated serial number—is not protected by the Second Amendment's plain text, and a firearm with an obliterated serial number is not "in common use" within the Second Amendment's scope**

The Second Amendment protects the right of "law abiding, responsible citizens" to keep firearms in their homes for self-defense. *See Heller*, 554 U.S. at 635. "Like most rights, the right secured by the Second Amendment is not unlimited" and is "not a right to keep and carry any

weapon whatsoever in any manner whatsoever and for whatever purposes." *Id*. at 626.  The *Heller* Court instructed that "nothing in the opinion should be taken to cast doubt" on certain "presumptively lawful regulatory measures," such as "longstanding prohibitions on the possession of firearms by felons and the mentally ill," "laws forbidding the carrying of firearms in sensitive places," and "laws imposing conditions and qualifications on the commercial sale of arms."  *Id*. at 626-27 & n.26.   As the *Bruen* Court held, the Second Amendment protects the right to keep and bear arms that are "in common use today for lawful purposes like self-defense," *see Bruen*, 142 S. Ct. at 2134, not those that are "dangerous and unusual" or that are not commonly used for lawful purposes, *id*. at 2128. As Justice Kavanaugh emphasized in his concurrence (joined by the Chief Justice), "[p]roperly interpreted, the Second Amendment allows a 'variety' of gun regulations." *Id.* at 2162 (Kavanaugh, J., concurring) (quoting *Heller,* 554 U.S. at 636). In his concurrence, Justice Alito emphasized that *Bruen* does not "disturb[] anything that [the Court] said in *Heller* or *McDonald* . . . about restrictions that may be imposed on the possession or carrying of guns."  *Id*. at 2157 (Alito, J., concurring).   Thus, under the reasoning of *Bruen, Heller* and even *Rahimi*, Section 922(k) remains constitutional.

Under both *Bruen* and *Rahimi*, the first question when considering the constitutionality of a firearms regulation is whether "the Second Amendment's plain text covers an individual's conduct."  *Bruen*, 142 S. Ct. at 2126; *Rahimi*, 2023 WL 2317796 at 6; *see also United States v. Reyna*, 2022 WL 17714376, *4 (N.D. Ind. Dec. 15, 2022) ("§ 922(k)'s regulated conduct is 'possession of a firearm with an obliterated serial number' and not 'mere possession'").[3]  It is well-settled that "the Second Amendment does not protect those weapons not typically possessed by

---

[3]   To date, only one outlier district court has found §922(k) unconstitutional.  *See United States v. Price*, ___ F. Supp. ___, 2022 WL 6968457 (S.D. W. Va. 2022), *gov't appeal pending*, No. 22-4609 (4th Cir.).  *Price* was fully discussed in the United States' initial response (D.E. 22).

law-abiding citizens for lawful purposes." *Heller*, 554 U.S. at 625; *see also Friedman v. City of Highland Park, Ill*, 136 S. Ct. 447, 449 (2015) (Thomas, J., dissenting from denial of certiorari) ("The question under *Heller* is not whether citizens have adequate alternatives available for self-defense.  Rather, *Heller* asks whether the law bans types of firearms *commonly used for a lawful purpose*—regardless of whether alternatives exist.") (emphasis added).  Accordingly, possession of a firearm with an obliterated serial number is not protected by the Second Amendment's plain text because such firearms are unusual, and not "typically possessed by law-abiding citizens for lawful purposes," which places them outside the historical scope of the Second Amendment.  *See Heller*, 554 U.S. at 625.  As the Third Circuit has observed, "we . . . cannot conceive of a lawful purpose for which a person would prefer an unmarked firearm." *United States v. Marzzarella*, 614 F.3d 85, 99 (3rd Cir. 2010).  Thus, § 922(k)'s burden "will almost always fall only on those intending to engage in illicit behavior." *Id.* at 99.  *Accord Reyna*, 2022 WL 17714376 at * 5 ("Guns with obliterated serial numbers belong to 'those weapons not typically possessed by law-abiding citizens for lawful purposes' so possession of such guns isn't within the Second Amendment's scope.") (citing *Heller*, 554 U.S. at 625).

*Rahimi* specifically rejected the argument that non-law-abiding citizens are categorically excluded from the Second Amendment's protection: "*Heller's* reference to 'law-abiding, responsible' citizens meant to exclude from the Court's discussion groups that have historically been stripped of their Second Amendment rights, i.e., groups whose disarmament the Founders 'presumptively' tolerated or would have tolerated." *Rahimi*, 2023 WL 2317796 at *4 (quoting *Heller*, 554 U.S. at 627 n.26).  It held that Rahimi fell into the category of "law-abiding, responsible" citizens because, although he was subject to a civil domestic restraining order, he had not been criminally convicted or indicted for any offense. *Rahimi*, 2023 WL 2317796 at *5-*7.

In short, the conduct regulated by § 922(k)—the possession of a firearm with an obliterated serial number—is not covered by the plain text of the Second Amendment because such a firearm is not in "common use" by law-abiding citizens as contemplated by the Amendment.

**B.   Even if the regulated conduct fell within the scope of the Second Amendment, *arguendo*, Section 922(k) is analogous to historical firearms regulations**

### 1.   Supreme Court Precedent

Even if the conduct regulated by § 922(k) were presumptively protected under the Second Amendment, the statute would still be constitutional because it is "consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2130.  As explained below, § 922(k) is analogous to historical laws regulating firearms and gunpowder, most notably laws prohibiting alteration of proof marks on gun barrels.

There have been proscriptions on the commercial sale and transport of firearms since the Founding Era. In *Heller*, the Supreme Court specifically provided that its ruling would not call into question regulations on the "commercial sale of firearms." *Heller*, 554 U.S. at 626. This example was included in a laundry list of "long-standing" prohibitions that were to be considered presumptively valid—and the Court noted that its list was not exhaustive. *See id*. at 626-27. Section 922(k) is clearly a statute affecting, and relating to, the commercial sale of firearms. This should end the matter

Moreover, § 922(k)'s prohibition does not "infringe" on the central right protected by the Second Amendment:  the right to armed self-defense.  Individual self-defense "'is the central component' of the Second Amendment right." *McDonald*, 561 U.S. at 767 (quoting *Heller*, 554 U.S. at 599).  Section 922(k) creates no imposition on that right. Whether a serial number is on a gun or not has nothing to do with the retention or carrying of the gun.  Accordingly, the term "keep" is not implicated here, nor is the term "bear arms" at issue. Hence, the regulation in §

13

922(k) does not implicate the Second Amendment's "plain text" at all.  *Accord Marzzarella*, 614 F.3d at 94 ("the presence of a serial number does not impair the use or functioning of a weapon in any way"); *United States v. Holton*, ___ F. Supp. 3d ___, 2022 WL 16701935, *4 (N.D. Tex. Nov. 3, 2022) ("[F]irearms of similar make and model are essentially fungible, and the presence of a serial number does not impair the use or functioning of a weapon in any way[.] . . . [A] person is just as capable of defending himself with a marked firearm as with an unmarked firearm."); *see also United States v. Serrano*, ___ F. Supp. 3d ___, 2023 WL 2297447, *12 (S.D. Cal. Mar. 2, 2023) (same); *United States v. Tita*, 2022 WL 17850250, *7-*8 (D. Md. Dec. 22, 2022) (same).

Moreover, any burden that § 922(k) imposes on the right to self-defense is even less burdensome that other regulations *Bruen* indicated do not infringe on that right.  *See*, *e.g*., *Bruen*, 142 S. Ct. at 2138 n.9 (emphasizing that *Bruen s*hould  not be interpreted to suggest the unconstitutionality of the "shall-issue" firearm-carry licensing schemes that exist in 43 states, which generally require applicants to undergo a background check or pass a firearms safety course; such laws "are designed to ensure only that those bearing arms in the jurisdiction are, in fact, 'law-abiding responsible citizens.'") (quoting *Heller,* 554 U.S. at 635).

Delving deeper into historical sources under the second prong of the *Bruen* test, it is clear that § 922(k) is permissible and consistent with long-standing firearm regulations going back to the Founding Era. Courts have recognized that "colonial governments substantially controlled the firearms trade" long before serial numbers became common.  *See Teixeira v. City of Alameda*, 873 F.3d 670, 685 (9th Cir. 2017) (en banc).

Many of the colonies enacted laws regarding the registration of firearms as part of legislative schemes regarding the sale, transfer, and taxation of firearms. For example, "a 1652 New York law outlawed illegal trading of guns, gun powder, and lead by private individuals . . .

14

A 1631 Virginia law required the recording not only of all new arrivals to the colony, but also 'of arms and munitions.' . . . In the 1800s, three southern states imposed taxes on personally held firearms." Robert Spitzer, *Gun Law History in the United States and the Second Amendment*, 80 Law & Contemp. Probs. 55, 76 (2017).

Similarly, in the early 17th century, Connecticut banned residents from selling firearms outside the colony. *Teixeira*, 873 F.3d at 685. Virginia likewise provided that people were at "liberty to sell armes and ammunition to any of his majesties loyall subjects *inhabiting this colony*." *Id.* at 685 n.18 (emphasis added; quotation marks omitted). At least six colonies made it a crime (with severe penalties) to sell or provide firearms or ammunition to Native Americans. *Id.* at 685 (citing 17th-century laws from Massachusetts, Connecticut, Maryland and Virginia); *see also* 6 Statutes at Large of Pennsylvania from 1682 to 1801 at 319-20 (1863 law); Laws and Ordinances of New Netherland, 1638-1674 (1868) at 18-19 (1639 ordinance), 47 (1645 ordinance), 278 (1656 ordinance). Although not an exact analogy to § 922(k), these laws show that colonial legislatures were concerned about the movement of firearms between private parties and the dangers of firearms falling into the wrong hands.

Additionally, several states had laws relating to the inspection and marking of gunpowder, which "was essential to the operation of firearms at that time;" gunpowder regulations "necessarily affected the ability of gun owners to use firearms for self-defense." *Miller, et al., v. Bonta, et al.*, No. 3:29-cv-1537 (S.D. Cal. 2022) (D.E. 137-3 at 22) (Declaration of Prof. Saul Cornell); *cf. Bruen*, 142 S. Ct. at 2419 (citing article by Cornell). In 1776, both Rhode Island and New Jersey adopted laws requiring gunpowder to be inspected and marked. *See* 8 Records of the State of Rhode Island and Providence Plantations in New England, 18 (1863) (1776 law requiring inspector to mark cask "with the two first letters of the manufacturer's name" and "with the letters U.S.A.");

Rutgers, New Jersey Session Laws Online, Acts of the General Assembly of the State of New-Jersey, Legislature Number 1 at 7 (1776 law requiring inspector to mark casks "with the Letters S N I"). In 1795, Pennsylvania enacted a law requiring that all gunpowder stored in the public magazine must be proved and marked, and prohibiting the importation, transfer, or sale of any gunpowder that was not properly marked. 3 Laws of the Commonwealth of Pennsylvania, from the Fourteenth Day of October, One Thousand Seven Hundred (1810). In 1809, Massachusetts required the inspection of all gunpowder manufactured in the commonwealth or stored in a public magazine, with the inspector marking each cask as either "Massachusetts Inspected Proof" or "Condemned" and adding his name and the year. 2 General Laws of Massachusetts from the Adoption of the Constitution to February 1822, at 199 (1823). The law imposed a fine of between $200 and $500 on any person who sold condemned gunpowder or "fraudulently alter[ed], or deface[d] any marks, placed by any inspector upon any cask or casks containing gunpower." *Id.* New Hampshire adopted a very similar law in 1829. Laws of the State of New Hampshire; with the Constitutions of the United States and of the State Prefixed (1830).

Colonial and early state governments likewise prohibited the manufacture and transportation of gunpowder without a license. *See* Colonial Laws of Massachusetts Reprinted from the Edition of 1672, at 126 (1890) (1651 statute) ("no person . . . shall transport any Gun-powder out of this Jurisdiction, without license first obtained from some two of the Magistrates"); 15 The Public Records of the Colony of Connecticut 191 (1775 statute) (no "gun-powder made and manufactured . . . shall be exported out of the [Colony] without . . . license"); The Charter and Ordinances of the City of Providence, with the General Assembly Relating to the City 37 (1835) (1821 law) (prohibiting selling gunpowder within the town of Providence "without having a license therefor"). Further, and consistent with this Founding Era tradition, States continued to

16

enact laws governing "the manufacture, sale, [and] transport" of guns and ammunition in the 18th and 19th centuries. *See* Spitzer article, *supra* at 74. For example, in 1820 "New Hampshire created and appointed state gunpowder inspectors to examine every storage and manufacturing site." *Id.*

Most relevant here, at least two states in the early republic required gun barrels to be proved and marked and prohibited the obliteration of the proof marks. *See Heller*, 554 U.S. at 605 (observing that examining the "public understanding of a legal text in the period after its enactment or ratification" is "a critical tool of constitutional interpretation") (emphasis omitted). In 1805, Massachusetts adopted a law for the appointment of "provers of fire arms" to "prove all musket barrels and pistol barrels" presented to them in exchange for a set fee. Laws of the Commonwealth of Massachusetts from November 28, 1780, to February 28, 1807, at 259 (1807). The law was adopted to prevent firearms from being "introduced into use which are unsafe, and thereby the lives of the citizens be exposed." *Id.*

Under Massachusetts, law, the prover was required to "stamp" the barrel "within one and an half inches of the breech" with the prover's initials, the letters "P." and "M." and the year—all in "letters and figures . . . so deeply impressed . . . as that same cannot be erased or disfigured." Laws of the Commonwealth of Massachusetts, *supra* at 260. The Act imposed a $10 fine on any person who manufactured within the Commonwealth "any musket or pistol, without having the barrels proved and stamped as aforesaid." *Id*. at 260. It imposed a $10 fine for selling, delivering or purchasing any unmarked musket or pistol manufactured in the Commonwealth. *Id.* at 260-61. It further imposed a fine of $20 to $50 on any person who "shall falsely force or alter the stamp of any prover of fire-arms . . . impressed on any musket or pistol barrel." *Id.* at 261. Massachusetts slightly amended this act in 1814 but kept the provision prohibiting alteration of the prover's

stamp.  Laws of the Commonwealth of Massachusetts from February 28, 1807, to February 28, 1814, at 536-37 (1814).

Similarly, in 1821 Maine passed a law requiring the appointment of "suitable persons, to be provers or the barrels of all new, or unused firearms."  Laws of the State of Maine 546 (1830). Each prover was required (in exchange for compensation) to "prove and try the strength of the barrels of all firearms which shall be offered to him for that purpose, in such manner as to satisfy himself of the strength of the same," to "in a permanent manner, mark and number every barrel by him so proved," and to provide a certificate attesting to the proof.  *Id*.  The statute imposed a $10 fine on any person who "shall sell or offer for sale within this State, any new, or unused musket, rifle or pistol barrel, without having the same first proved, marked and certified."  *Id*.  Additionally, it imposed a fine of $20 to $100 for any person who "shall falsely alter the stamp or mark or the certificate of any prover of firearms."  *Id*.

Although these statutes are not identical to § 922(k), they are "relevantly similar."  *Bruen*, 142 S. Ct. at 2132.  *Bruen* made clear that the government need only identify a "historical *analogue*, not a historical *twin*."  *Id*. at 2133.  The ultimate question is "whether modern and historical regulations imposed a comparable burden on the right of armed self-defense and whether that burden is comparably justified."  *Id*. at 2133.

As explained above, § 922(k) imposes at most a minimal "burden on the right of armed self-defense" because marked firearms are ubiquitous and just as effective for self-defense as unmarked firearms.  That burden is no greater than the burdens imposed by historical laws relating to the sale and marking of firearms and gunpowder.  Neither the historical laws nor § 922(k) deprived citizens of the use of firearms for self-defense. *See Holton*, 2022 WL 16701935 at *5

(observing that "[n]*ot removing* the serial number from a firearm" is a "negligible burden" compared to historical restrictions on firearm possession").

Section 922(k) is also "comparably justified." *See Bruen*, 142 S. Ct. at 2133. The historical regulations on commerce in firearms were designed to keep firearms out of the hands of those who might be dangerous, such as (in the view of legislators at the time) Native Americans. The laws requiring marking of gun barrels and gunpowder were designed to protect citizens from explosions and to allow unsafe barrels or powder to be traced to the inspector who first affixed the markings. Section 922(k) serves similar purposes by allowing authorities to recover stolen firearms and trace firearms that have been used in a crime. *See Marzzarella*, 614 F.3d at 98; *United States v. Mobley*, 956 F.2d 450, 454 (3d Cir. 1992). Although § 922(k) does not reflect precisely the same legislative priorities as these historical regulations, it nevertheless imposes a "comparable burden" that is "comparably justified." *Bruen*, 142 S. Ct. at 2133. To date, three district courts who have considered this issue have correctly determined that "§ 922(k) is consistent with this Nation's history and tradition of firearm regulations." *Serrano*, 2023 WL 2297447 at *12; *Tita*, 2022 WL 17850250 at *7-*8; *Holton*, 2022 WL 16701935 at *5.

In sum, historical sources demonstrate a panoply of laws from the Founding Era which required firearm "registration," and which heavily regulated the sale and transfer of firearms—and particularly excluded sales outside the colony. These laws also required stamped "proofs" on firearms. These are historical analogues to the current serial number requirement, which is necessary to, and in aid of, modern legislative schemes regulating firearms in commerce. To whatever extent Merriman claims serial numbers are a recent invention without any historical analog, *see Defendant's Motion to Dismiss* at 2, this is a distinction without a difference. The Supreme Court held that the Second Amendment was not cabined only to firearms actually in

19

existence in 1791; rather, the protections applied to guns in modern usage. *Heller,* 554 U.S. at 582. As the above examples demonstrate, there are more than sufficient historical analogues for Section 922(k) to pass muster. Therefore, the requirement that unaltered serial numbers are required to transport, ship, receive, or possess firearms is a "condition" that does not violate the Second Amendment.

### 2.    *Rahimi* Analysis

Under *Rahimi,* if the defendant's conduct is covered by the plain text of the Second Amendment, the Government must show "*how* the challenged law burdens the right to armed self-defense, and *why* the law burdens that right." *Rahimi*, 2023 WL 2317796 at *7 (citing *Bruen*, 142 S. Ct. at 2133) (emphasis in original). Even if the conduct regulated by §922(k) were covered by the plain text of the Second Amendment, *arguendo*, Merriman cannot satisfy *Rahimi*. As to the "how," § 922(k) does not infringe at all on the right of law-abiding citizens to engage in armed self-defense, as explained above. A law-abiding individual can defend herself very well with a firearm bearing the required serial number. As to the "why," the requirement of a serial number is an administrative measure meant to regulate commercial firearms sales, guarantee the firearm was safely manufactured, and assist in the investigation and prevention of armed criminal offenses by non-law-abiding persons. Moreover, § 922(k) is not aimed at protecting only a certain class of people (in *Rahimi*, persons at risk of domestic gun abuse). *See id*. at *8-*11. Rather, it is aimed at generally protecting the validity of commercial gun sales and the safety of all the nation's residents. Accordingly, even under *Rahimi,* § 922(k) does not infringe in any way on the right to armed self-defense by law-abiding citizens.

**IV.     CONCLUSION**

The Supreme Court is clear that the Second Amendment protects possession and use of firearms only for lawful purposes by "ordinary, law-abiding citizens." *Bruen*, 142 S. Ct. at 2122. The Constitution does not protect the conduct § 922(k) prohibits, namely possessing a firearm with an obliterated serial number.  Moreover, even if such conduct were covered, the statute is consistent with the nation's historical tradition of firearm regulation.  Therefore, the statute is constitutional.   Merriman's motion to dismiss the indictment should be denied.

                                                              Respectfully submitted,

                                                              ALAMDAR S. HAMDANI
                                                              United States Attorney

                                     By*:*     *s/Gerard A. Cantu*
                                                              Gerard A. Cantu
                                                              Assistant United States Attorney
                                                              11204 McPherson Road, Suite 100A
                                                              Laredo, TX 78045
                                                              Gerard.Cantu@usdoj.gov
                                                              956-723-6523

                                                              *s/ Amy Howell Alaniz*
                                                              Amy Howell Alaniz
                                                              Assistant United States Attorney
                                                              Attorney for Respondent
                                                              1000 Louisiana St., Suite 2300
                                                              Houston, TX  77002
                                                              SDTX No. 883498
                                                              (713) 567-9102
                                                              Facsimile: (713) 718-3302

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 22, 2023, I served a true and correct copy of  Government's Response in Opposition to Defendant's Motion to Dismiss in the above-captioned case, via the court's e-noticing system and email to Defendant's counsel, Mr. Carlos Alaniz, Assistant Federal Public Defender.

By: *s/Gerard A. Cantu*
Gerard A. Cantu
Assistant United States Attorney
11204 McPherson Road, Suite 100A
Laredo, TX 78045
Gerard.Cantu@usdoj.gov
956-723-6523