IN THE UNITED STATES DISTRICT
COURT FOR THE SOUTHERN DISTRICT
OF TEXAS LAREDO DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| V | § | Cr. No. 5:22-CR-01439 |
| | § | |
| MARSHALL STEVE MERRIMAN | § | |

## DEFENDANT'S SUPPLEMENTAL BRIEF IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS

The question in this case is *not* whether prohibiting the possession unserialized firearms is sensible policy.  The question is whether the statute that does so, 18 U.S.C. § 922(k), is constitutional under the Second Amendment of the United States Constitution. In the light of *N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022), and *United States v. Rahimi*, 61 F.4th 443 (5th Cir. 2023), it is not.

1. **Procedural History**

The indictment charges Mr. Merriman with knowingly possessing a firearm, a Sig Sauer model P224, .357 caliber handgun, that had been shipped and transported in interstate commerce, from which the manufacturer's serial number had been removed, altered and obliterated, in violation of Title 18, United States Code, section 922(k) and its related penalty provision (section 924(a)(1)(B)).

On December 9, 2022, Mr. Merriman moved to dismiss the indictment on the ground that § 922(k) is unconstitutional after *N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022).  On January 19, 2023, the government filed a response opposing that motion to dismiss.

Shortly thereafter, the Fifth Circuit decided *United States v. Rahimi*, 61 F.4th 443 (5th Cir. 2023).  *Rahimi* marked the first time our Circuit applied *Bruen*'s standards, and this Court ordered both parties to file supplemental briefing in light of that decision.

1

On March 22, 2023, the government filed its supplemental opposition.  Today, Mr. Merriman files his supplemental brief in support of his motion to dismiss.  He also respectfully requests oral argument on this important issue of constitutional law at a time that is convenient for the Court.

2.  **Legal Background**

a.  ***Heller*** and ***Bruen***: **A History-Based Framework for Evaluating Challenged Regulations**

The Second Amendment to the U.S. Constitution establishes that a "well-regulated militia, being necessary to the security of a free state, the right of the people to keep and bear arms, shall not be infringed."  U.S. const. amend. II.  In *District of Columbia v. Heller*, the Supreme Court held that the Second Amendment codifies an individual right to possess and carry weapons and struck down the District of Columbia's handgun ban.  *See* 554 U.S. 570, 595, 635 (2008).  The Court grounded its conclusion in an extensive review of history, including American colonial views, founding-era legal scholars, "arms-bearing rights in state constitutions that preceded and immediately followed the adoption of the Second Amendment," and other evidence.  *See id.* 595-610.

*New York State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111 (2022), clarified *Heller*'s history-based framework for evaluating firearm regulations.  In *Bruen*, the Supreme Court struck down New York's requirement that citizens obtain a permit to carry firearms in public based on a showing of proper cause.  *Id.* at 2156.  *Bruen* began by rejecting the lower court's decision to use a test based on means-ends scrutiny to evaluate the challenged law.  *Id.* at 2125-26.  "*Heller*," the *Bruen* Court explained, "rejected the application of any judge-empowering 'interest-balancing inquiry' that 'asks whether the statute burdens a protected interest in a way or to an extent that is out of proportion to the statute's salutary effects upon other important governmental interests.'"

*Id.* at 2129 (quoting *Heller*, 554 U.S. at 634).  "The very enumeration of the right takes out of the hands of government—even the Third Branch of Government—the power to decide on a case-by-case basis whether the right is really worth insisting upon."  *Id.* (quoting *Heller*, 554 U.S. at 634).  "A constitutional guarantee subject to future judges' assessments of its usefulness is no constitutional guarantee at all."  *Id.* (quoting *Heller*, 554 U.S. at 634).[1]

Instead, *Bruen* adopted a different legal test, which proceeds in two steps.  At the first step, a court must determine whether the conduct prohibited by the challenged regulation falls within the Second Amendment's "plain text."  *Id.* at 2129-30, 2134-35.  If it does, it is presumptively unconstitutional.  *Id.* at 2129-30.  To overcome that presumption, at the second step, the government bears the burden of proving that that the challenged regulation is consistent with our Nation's tradition of firearm regulation.  *See id.* at 2126, 1230.  If the government cannot satisfy its burden, the restriction is unconstitutional under the Second Amendment.  *See id.*

---

[1] For this reason, the government's statements about § 922(k)'s merits as a policy matter are legally irrelevant.  But since the government expends considerable ink on those atmospherics, it bears noting that § 922(k) is not the panacea the government's brief suggests.  Firearms are usually traceable only to the first retail purchaser.  Department of the Treasury, *Following the Gun: Enforcing Federal Laws Against Firearms Traffickers* x (2000), https://www.hsdl.org/c/view?docid=1622; Department of the Treasury, *Gun Shows: Brady Checks and Crime Gun Traces*, 7 n.18, https://www.ojp.gov/ncjrs/virtual-library/abstracts/gun-shows-brady-checks-and-crime-gun-traces.  Private sellers in the same state are not required to record their sales, so firearms sold second hand are not traceable.  *See* ATF, *What recordkeeping procedures should be followed when two unlicensed individuals want to engage in a firearms transaction?* (Apr. 12, 2022), https://tinyurl.com/y6by3sax; Texas State Library, *Gun Laws:  Do I need to register my guns?*, https://tinyurl.com/-yyaffpdd (last accessed May 9, 2023) ("The State of Texas does not maintain a registry of firearms."); *Following in the Gun*, *supra*, at 17 (referring to firearms sold secondhand as "untraceable").  As a result, guns found at crime scenes are regularly untraceable for reasons that have nothing to do with whether they have intact serial numbers.  For example, sixty percent, or over half, of ATF investigations involve secondhand guns.  *See Following in the Gun*, *supra*, at x; *see also* Philip J. Cood, Stephanie Molliconi, and Thomas B. Cole, *Regulating Gun Markets*, 86 J. Crim. L. & Criminology, 59, 70 (1995) (estimating that half of gun purchases each year are used guns purchased in the secondary market).

*Bruen* set out two different standards for deciding whether a challenged regulation is consistent with historical firearm regulation. Which standard applies depends on what kind of problem a statute targets and whether it is old or new.

Where "a challenged regulation addresses a general societal problem that has persisted since the 18th century," the historical inquiry is "fairly straightforward." *Bruen*, 142 S. Ct. at 2131. For such statutes, "the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment." *Id.* If "the Founders themselves could have adopted" a particular regulation "to confront [a longstanding] problem," but did not do so, then the law "[i]s unconstitutional" today. *Id.* Similarly, "if earlier generations addressed the societal problem, but did so through materially different means, that also could be evidence that a modern regulation is unconstitutional." *Id. Bruen* explained that both it and *Heller* fell in this first category: the laws challenged in those cases were aimed at a problem – "violence, primarily in urban areas" – that existed at the founding, and the Court therefore required a tight fit between those laws and historical precursors. *Id.*

In "other cases," a challenged law will "implicat[e] unprecedented societal concerns or dramatic technological changes," or will be addressed to "challenges" that are "not . . . the same as those that preoccupied the Founders in 1791." *Bruen*, 142 S. Ct. at 2132. Historical inquiry into these statutes "may require a more nuanced approach," which "will often involve reasoning by analogy." *Id.* Deciding "whether a historical regulation is a proper analogue for a distinctly modern firearm regulation requires a determination of whether the two regulations are relevantly similar." *Id.* (emphasis added). The "central considerations" in the "relevantly similar" analysis are "whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified"—what the Court called the "how"

4

and the "why." *Id.* at 2133 (emphasis omitted).  Unlike the "distinctly similar" standard, the "relevantly similar" standard may be satisfied even if the Government does not identify "a historical twin" or "a dead ringer" for a modern firearm regulation.  *Id.*

Under either standard, the government must point to a robust national "tradition" of firearm regulation.  A "tradition" is "a governmental practice that has been open, widespread, and unchallenged since the early days of the Republic."  *Id.* at 2137 (cleaned up).  "Outlier" historical regulations cannot establish a national tradition of firearm regulation.  *Id.* at 2133, 2156.  Indeed, the *Bruen* Court "doubt[ed] that three colonial regulations could suffice to show a tradition" of firearm regulation.  *Id.* at 2142 (emphasis in original).

**b.  *Rahimi*:  applying the history-based framework**

In *United States v. Rahimi*, 61 F.4th 443 (5th Cir. 2023), the Circuit applied *Bruen*'s two-step framework for the first time.  It held that § 922(g)(8)'s ban on firearm possession by those under a domestic violence restraining order was unconstitutional under the Second Amendment. *Rahimi*, 61 F.4th at 448.

At *Bruen*'s Step One, the Circuit explained that the conduct regulated by § 922(g)(8) fell within the Second Amendment's plain text.  *See id.* at 454.  The Second Amendment grants people "the right 'to keep' firearms, and 'possession' is included within the meaning of 'keep.'"  *Id*.  So, Mr. Rahimi's possession of firearms, which § 922(g)(8) purported to outlaw, was presumptively protected by the Second Amendment.  *Id.*

At *Bruen*'s Step Two, the Circuit considered the government's historical analogues for § 922(g)(8) and found them wanting.  Applying the "relevantly similar" standard, *Rahimi* first isolated "'how' and 'why' § 922(g)(8) 'burden[s] a law-abiding citizen's right to armed self-defense.'"  *Id.* at 455 (quoting *Bruen*, 142 S. Ct. at 2133).  It looked to several critical features of

the statute including: (1) what the Second Amendment burden was (forfeiture of the right to possess weapons); (2) under what circumstances the burden applied ((a) after a civil proceeding (b) in which a court entered a protective order based on a finding of a "credible threat"); and (3) what the justification for that burden was (to protect the public from domestic gun abuse).  *See id.* The first two features, the Circuit explained, were the "how" of the challenged law.  *Id.*  The third was the "why."  *Id.*

The Circuit found that none of the statutes offered up by the government matched this array of features, and in doing so it made clear that a tight fit is required between the historical regulations identified by the government and the modern-day regulation it seeks to justify.  The absence of even one of the above features was enough to kill a comparison.

For example, the government tried to point to "laws in several colonies and states that disarmed classes of people thought to be dangerous"—slaves, Native Americans, and those unwilling to take an oath of allegiance.  *Id.* at 456.  While the Second Amendment burden was the same—disarmament—the Circuit found that those laws were not analogous to § 922(g)(8) because the justification or "why" was different.  "These laws disarmed people thought to pose a threat to the security of the state due to their perceived lack of loyalty or societal status."  *Id.* at 547.  Section 922(g)(8), on the other hand, disarmed people to "protect[] an identified person from the threat of domestic gun abuse."  *Id.* (internal quotation marks and citation omitted).  Because the "purpose" of the laws was different, they were not "relevantly similar."  *Id.*

The Circuit rejected the government's analogy to "going armed" laws too.  Although the Circuit made clear that there were multiple material differences in between "going armed" laws and § 922(g)(8), it also made clear that any one of those differences was enough to doom the government's analogy.  For example, the Court explained that going armed laws disarmed people

"after criminal proceedings and conviction," while § 922(g)(8) disarms people after they were "civilly adjudicated to a threat to another person" (or are "simply governed by a civil order" that prohibits the use of force). *Id.* at 458-459. That difference, and the attendant difference in due-process related protections between criminal and civil proceedings, "*alone* defeat[ed] the 'going armed' laws as useful analogues for § 922(g)(8)." *Id.* at 459 (emphasis added).

Finally, the Circuit also rejected the government's analogy to state surety laws—which permitted an individual who could show that he had "just cause to fear" another to demand "surety of the peace against such person." *Id.* at 459-60 (quoting 4 William Blackstone, *Commentaries On The Laws Of England* 252 (1769). The Circuit noted that this comparison was a relatively close one. The Circuit held that these laws were "comparably justified" because they were both targeted at preventing violence by identified individuals against other identified individuals. *Id.* at 459-60 & n.10. Furthermore, surety laws, like § 922(g)(8), "require[d] only a civil proceeding, not a criminal conviction," to kick in. *Id.* at 460. However, for all these similarities, surety laws had one critical difference: they did not require forfeiture of the right to possess weapons. *Id.* Unlike with § 922(g)(8), someone subject to a surety requirement could simply "post surety" and be allowed to continue possess their weapons and carry them in public. *Id.* Thus, even the analogy between state surety laws and § 922(g)(8) was not a tight enough fit because one aspect of the "how"—the burden on the Second Amendment right—was different. *See id.*

Because none of the laws identified by the government were "relevantly similar" to § 922(g), the Circuit held that the Government had failed "to demonstrate that § 922(g)(8)'s restriction of the Second Amendment right fits within our Nation's historical tradition of firearm regulation." *Id.* at 460. It therefore vacated Mr. Rahimi's conviction.

    **c.** ***Rahimi*: what it left open**

7

For all of this helpful analysis, *Rahimi* still left two questions at issue here unanswered. They are worth pausing to highlight briefly.

The first is whether the Supreme Court's predictions about the types of gun regulations that are constitutional (felon-in-possession, bans on guns in sensitive places, bans on dangerous and unusual guns, etc.) should be evaluated at Step One or Step Two. In *Rahimi*, the Circuit discussed whether *Heller* and *Bruen*'s prediction that laws restricting handgun possession to "law abiding, responsible citizens" are constitutional should be part of the threshold analysis of the scope of the Second Amendment right (Step One) or part of the analysis of the legislature's power to take that right away (Step Two). *Rahimi* outlined both approaches and appeared to say that *Heller* and *Bruen*'s "law abiding" *dicta* is part of Step Two's approach. *See United States v. Rahimi*, 61 F.4th 443, 452 (5th Cir. 2023) ("The Government's argument that Rahimi falls outside the community covered by the Second Amendment rests on the first approach [(Step One)]. But it runs headlong into *Heller* and *Bruen*, which we read to espouse the second one [(Step Two)]."). However, some of *Rahimi*'s later discussion seems to backtrack on this conclusion, without ever acknowledging that it is doing so. *See id.* at 453 ("Rahimi, while hardly a model citizen, is nonetheless among 'the people' entitled to the Second Amendment's guarantees."). Taken as a whole, *Rahimi* is sufficiently muddled that it likely leaves open the question of whether this sort of *dicta* is relevant at Step One or Step Two.

Second, *Rahimi* elides the question of whether *Bruen*'s "distinctly similar" and "relevantly similar" tests are different or one and the same. *Bruen*, by its terms, treats them as different. *See Bruen*, 142 S. Ct. at 2131-33. But *Rahimi*, like many other courts, did not speak about these tests with precision and instead conflated them. *See Rahimi*, 61 F.4th at 453-54. Since § 922(g)(8) failed even the more generous "relevantly similar" test, this makes sense. Additional precision

was not necessary.

After *Rahimi*, the best practice is still to follow *Bruen* and determine at the threshold whether that the problem at which the statute was aimed existed in 1791 or instead grows out of "unprecedented," "unimaginable" societal changes.  *See Bruen* 142 S. Ct. at 213; *United States v. Lewis*, 2023 WL 187582, at *3 (W.D. Okla. 2023) (explaining that *Bruen* "articulate[s] two standards for assessment of the Government's proffered historical analogues, depending on whether the 'challenged regulation addresses a general societal problem that has persisted since the 18th century,' or whether the statute addresses 'unprecedented societal concerns or dramatic technological changes'").  *But see United States v. Connelly*, No. EP-22-CR-229(2)-KC, 2023 WL 2806324, at *6 (W.D. Tex. Apr. 6, 2023) (treating these standards as one test).  However, as *Rahimi* teaches us, doing so is not necessary when the challenged regulation fails under even the "relevantly similar" standard.

## ARGUMENT

Mr. Merriman asks this Court to dismiss the single-count indictment charging him with violating § 922(k) (and its associated penalty provision) because it runs afoul of the Second Amendment.  The conduct prohibited by § 922(k) falls within the Second Amendment's plain text because it bans possession of a category of firearms.  It is therefore presumptively unconstitutional.  The government's attempts to rebut that presumption fall short.  The founding-era legislation it points to is inapposite and, in some instances, too sparse to establish a historical traditional of firearm regulation at all.

### 1. Legal Standard

Federal Rule of Criminal Procedure 12(b)(1) allows a party to "raise by pretrial motion any defense, objection, or request that the court can determine without a trial on the merits."  These

include motions that allege "a defect in the indictment," including "failure to state an offense." Fed. R. Crim. P. 12(b)(3)(B)(v).  Second Amendment challenges like the one presented here are properly resolved on a motion to dismiss.  *See, e.g.*, *United States v. Price*, 2022 WL 6968457 (S.D.W. Va. Oct. 12, 2022) (granting motion to dismiss indictment charging violation of § 922(k)); *United States v. Perez-Gallan*, 2022 WL 16858516 (W.D. Tex. Nov. 10, 2022) (granting motion to dismiss indictment charging violation of § 922(g)(8)); *United States v. Combs*, 2023 WL 1466614 (E.D. Ky. Feb. 2, 2023) (same); *United States v. Hicks*, 2023 WL 164170 (W.D. Tex. Jan. 9, 2023) (granting motion to dismiss indictment charging violation of § 922(n)); *United States v. Quiroz*, 2022 WL 4352482 (W.D. Tex. Sept. 19, 2022) (same); *United States v. Holden*, 2022 WL 17103509 (N.D. Ind. Oct. 31, 2022) (same); *United States v. Stambaugh*, 2022 WL 16936043 (W.D. Okla. Nov. 14, 2022) (same); *United States v. Harrison*, 2023 WL 1771138 (W.D. Okla. Feb. 3, 2023) (granting motion to dismiss indictment charging violation of § 922(g)(3)); *Connelly*, 2023 WL 2806324 (granting motion to dismiss indictment charging violation of § 922(g)(3) and § 922(d)(3)).

2.  ***Bruen* Step One:  the conduct prohibited by § 922(k) falls within the Second Amendment's plain text.**

"The first question when considering the constitutionality of a firearms regulation is whether 'the Second Amendment's plain text covers an individual's conduct.'"  Gov. Supp. Br. 11.  Consisting of twenty-seven now familiar words, the Second Amendment provides the following:  "A well-regulated Militia, being necessary to the security of the free State, the right of the people to *keep and bear arms*, shall not be infringed."  U.S. Const. amend II (1791) (emphasis added).  The handgun Mr. Merriman possessed was an "arm" within the Second Amendment's text.  *See D.C. v. Heller*, 554 U.S. 570, 628-29 (2008) (handguns covered by the Second Amendment); *Bruen*, 142 S. Ct. at 2128 (same).  The fact that it does not have a serial number

does not change that.  The Second Amendment's text makes no distinction between serialized and unserialized firearms; with or without a serial number, an "arm" is still an "arm."  *See Price*, 2022 WL 6968457, at *6.

Section 922(k)'s ban on possessing that handgun also infringed on Mr. Merriman's right to "keep" it.  "The [Second] [A]mendment grants . . . the right 'to keep' firearms, and 'possession' is included within the meaning of 'keep.'"  *Rahimi*, 61 F.4th at 454.  Accordingly, the Second Amendment's plain text covers § 922(k), and Mr. Merriman has satisfied *Bruen* Step One.

The government disagrees.  It maintains that possession of an unserialized handgun falls outside the scope of the Second Amendment because: (1) unserialized firearms are not "in common use" for lawful purposes today, (2) § 922(k) is a restriction on the "commercial sale of firearms," and (3) § 922(k) does not "infringe" on the right to armed self-defense.  The government's arguments are mistaken.

> **a. The "in common use" limitation has no role to play in *Bruen*'s First Step, and, in any event, does not apply to unserialized firearms.**

The government argues that unserialized firearms are not protected by the Second Amendment because they are not "in common use" today and are "not typically possessed by law-abiding citizens for lawful purposes."  Gov. Supp. Br. 10-13.  This argument fails for three reasons.  First, this supposed limitation is relevant at *Bruen* Step Two, not *Bruen* Step One.  Second, the "in common use" language from *Bruen* and *Heller* expands the Second Amendment's coverage to modern firearms.  It does not exclude firearms based on features that would have been considered covered by the Second Amendment at the time of the founding.  Third, the "in common use" language is focused on weapons' visibly dangerous and "terrifying" functional features, such as automatic firing capability.  It is not focused on weapons—like unserialized firearms—which are banned for reasons unrelated to the dangerousness of their functional features.

11

The "in common use" test derives not from the Second Amendment's text, but historical tradition. *Heller* explained that the "in common use" limitation "is fairly supported by the historical tradition of prohibiting the carrying of dangerous and unusual weapons." *Id.* at 627 (emphasis added); *see also id.* (noting that limitation on firearms "not typically possessed by law-abiding citizens for lawful purposes" "accords with the historical understanding of the scope of the right."). In particular, *Heller* relied on a collection of treatises from the time of the founding up to the Civil War that described the common law offense of "affray" or "going armed" with dangerous and unusual weapons. *See id.*[2] *Bruen* similarly grounded the "in common use" standard in "historical understanding." *See* 142 S. Ct. at 2128 (prefacing discussion of the "in common use at the time" standard, by noting "[a]fter holding that the Second Amendment protected an individual right of armed self-defense, [*Heller*] also relied on the historical understanding of the Amendment to demark the limits on the exercise of that right"); *id.* at 2132 ("[W]e use history to determine which modern 'arms' are protected by the Second Amendment.").

As a result, the "in common use" standard has no role to play at *Bruen*'s first step, which "asks a strictly textual question." *United States v. Perez-Gallan*, 2022 WL 16858516, at *3 (W.D. Tex. Nov. 10, 2022). Instead, it is relevant at *Bruen* Step Two, where the Government bears the burden of establishing a robust, historical tradition of distinctly similar firearm regulation in order

---

[2] *Heller* cited the following treatises, all of which describe the offense of affray or going armed with dangerous and unusual weapons to terrify the citizenry: 4 Blackstone 148–149 (1769); 3 B. Wilson, *Works of the Honourable James Wilson* 79 (1804); J. Dunlap, *The New–York Justice* 8 (1815); C. Humphreys, *A Compendium of the Common Law in Force in Kentucky* 482 (1822); 1 W. Russell, *A Treatise on Crimes and Indictable Misdemeanors* 271-272 (1831); H. Stephen, *Summary of the Criminal Law* 48 (1840); E. Lewis, *An Abridgment of the Criminal Law of the United States* 64 (1847); F. Wharton, *A Treatise on the Criminal Law of the United States* 726 (1852).

to overcome the initial presumption of unconstitutionality.  *See Bruen*, 142 S. Ct. at 2126.[3]

Rahimi's passing reference to the "in common use" standard when discussing *Bruen* Step One does not change this result.  As explained earlier, *Rahimi*'s discussion of when and how to think about *Bruen* and *Heller*'s *dicta* about presumptively valid regulations was muddled at best.  This Court should treat that question as open and decide for itself whether the "in common use" standard belong at Step One or Step Two.

But even assuming "common use" is part of the *Bruen* Step One inquiry, possession of unserialized firearms is still covered by the Second Amendment.  Before *Heller* and *Bruen*, lower courts had tried to limit the Second Amendment to arms that existed at the time of the founding. *See, e.g.*, *Caetano v. Massachusetts*, 577 U.S. 411, 411 (2016) (reversing state court decision that held that particular weapon at issue was not protected because it was not in common use at the time of the Second Amendment's enactment).  The Supreme Court agreed that "the Second Amendment's definition of 'arms' [was] fixed according to its historical understanding," but it held that "that general definition covers modern instruments that facilitate armed self-defense." *Bruen*, 142 S. Ct. at 2123.  The *Bruen* court then used the "in common use" test invoked by the government here to explain why the Second Amendment's coverage *extends* to (some) modern firearms:

> Drawing from this historical tradition, we explained [in *Heller*] that the Second Amendment protects only the carrying of weapons that are those "in common use at the time," as opposed to those that "are highly unusual in society at large." Whatever the likelihood that handguns were considered "dangerous and unusual" during the colonial period, they are indisputably in "common use" for self-defense today.  They are, in fact, "the quintessential self-defense weapon."  Thus, even if

---

[3] In fact, in *Bruen*, the government tried to rely on the "going armed" laws like those described in the treatises from *Heller* to justify New York's public carry restrictions, and the Supreme Court considered them at *Bruen*'s Second Step. *Id.* at 2139-47.  The same thing happened in *Rahimi*. *Rahimi*, 61 F.4th at 457-57.  The analysis of these laws—and any test they might generate— belongs at Step Two.

these colonial laws prohibited the carrying of handguns because they were considered "dangerous and unusual weapons" in the 1690s, they provide no justification for laws restricting the public carry of weapons that are unquestionably in common use today.

*Bruen*, 142 S. Ct. at 2143.

In other words, *Bruen* and *Heller* were focused on explaining that the Second Amendment covers *both* firearms that were common at the time of the founding *and* those that are common today. *See Heller*, 554 U.S. at 582 ("[T]he Second Amendment extends, prima facie, to *all* instruments that constitute bearable arms.") (emphasis added); *Bruen*, 142 S. Ct. at 2132 (same). Neither opinion suggested that the Second Amendment's definition of "arms" excluded guns that were commonly used for lawful purposes at the founding because they are uncommon today. Given the Supreme Court's heavy emphasis in *Heller* and *Bruen* on history and preserving the right as it was understood at the founding, any suggestion to the contrary borders on absurd.

Take the following example: A founding-era-style musket was undoubtedly an "arm" in 1791. *See, e.g.*, *United States v. Miller*, 307 U.S. 174, 180 (1939) (discussing the "in common use" test and describing laws from the time of the founding that *required* men to be armed with muskets or other equivalent arms). It is no longer the weapon of choice for self-defense, but no one would seriously argue that such a musket (even if manufactured recently) is not an "arm" under the Second Amendment. Because a musket was an arm in 1791 when the Second Amendment was ratified, it remains an arm now. The text of the Second Amendment, after all, has not changed.

For the same reason, unserialized firearms are arms within the meaning of the Second Amendment. "Serial numbers were not required" or "in common use" at the founding, *Price*, 2022 WL 6968457, at *6, even though the technology for marking firearms with identifiers existed at that time. *See infra* 21. Instead, unserialized guns were in common use. *See Price*, 2022 WL

14

6968457, at *6.  Because an unserialized gun was an "arm" 1791, it remains an "arm" in 2023.

Finally, as noted above, *Heller* grounded the "in common use" requirement in this country's "historical tradition of prohibiting the carrying of dangerous and unusual weapons." *Heller*, 554 U.S. at 627; *see also Bruen*, 142 S. Ct. at 2128, 2143 (same).  In other words, the "in common use" and "dangerous and unusual" standards are two sides of the same coin.

*Heller*'s "dangerous and unusual" standard comes from a collection of treatises that described the common law offense of "going armed" with "dangerous and usual" weapons so as to "terrify[] the good people of the land."[4]  As a result, the features we should be concerned about when deciding whether a weapon is "dangerous and unusual" are those that will "cause a terror to the people" if they saw someone bearing that weapon in public.  *See also, e.g.*, *Bruen*, 142 S. Ct. at 2139-47 (discussing long history of these laws and their focus on the types of weapons (lance, armor, short pistol) and manner of carry that would terrify the public).

*Heller* offered specific examples of dangerous weapons.  It explained that "M-16 rifles and

---

[4] *See* Blackstone, *Commentaries on the Laws of England* 148-49 (1769) ("the offence of . . . going armed, with dangerous or unusual weapons, is a crime against the public peace, by terrifying the good people of the land"); 3 Bird Wilson, ed., *Works of the Honourable James Wilson* 79 (1804) ("[T]here may be an affray. . . where a man arms himself with dangerous and unusual weapons, in such a manner, as will naturally diffuse a terrour among the people."); John A. Dunlap, *The New-York Justice* 8 (1815) ("It is . . . an affray, at common law, for a man to arm himself with dangerous and unusual weapons, in such manner as will naturally cause terror to the people."); Charles Humphreys, *A Compendium of the Common Law in Force in Kentucky* 482 (1822). ("Riding or going armed with dangerous or unusual weapons[] is a crime against the public peace . . . [where it] terrif[ies] the people unnecessarily."); 1 William Oldnall Russell, *A Treatise on Crimes and Indictable Misdemeanors* 271 (1831) ("[I]n some cases there may be an affray where . . . persons arm themselves with dangerous and unusual weapons, in such a manner as will naturally cause a terror to the people"); *id.* at 272 (confirming "that no wearing of arms is within [the law's] meaning, unless it be accompanied with such circumstances as are apt to terrify the people"); Henry J. Stephen, *Summary of the Criminal Law* 48 (1840) (listing offense of "going armed with dangerous or unusual Weapons"); Francis Wharton, *A Treatise on the Criminal Law of the United States* 527-28 (1846) ("in some cases there may be an affray where . . . a man arms himself with dangerous and unusual weapons, in such a manner as will naturally cause a terror to the people").

the like," as well as arms that are "useful against modern-day bombers and tanks," can be banned. *Heller*, 554 U.S. at 627.  Although it did not go into detail about why they can be banned, there is an obvious fit between the weapons *Heller* lists and the sort of weapons that terrify when carried in public.  The weapons mentioned in *Heller* are visibly frightening firearms with obviously dangerous functional features.  An M-16 is a military assault weapon traditionally equipped with automatic firing capability.  *See M16 rifle*, Encyclopedia Britannica, https://www.britannica.com/-technology/M16-rifle (last accessed May 1, 2023).  Short-barreled shot guns, which *Heller* also acknowledges can be banned, *Heller*, 554 U.S. at 622, are visibly dangerous because their short barrels make them considerably less accurate.  *See* Robert Matthews, *Why are sawn-off shotguns more deadly?*, BBC Science Focus, https://www.sciencefocus.com/future-technology/why-are-sawn-off-shotguns-more-deadly/ (last accessed May 1, 2023).  In other words, the historical test highlighted by the *Heller* court fit the weapons it expressly mentioned like a glove.

The same cannot be said for unserialized firearms.  Serial numbers are small numbers typically found on the barrel of firearms.  Their presence has no bearing on the functionality and corresponding visible dangerousness of a firearm, and it is doubtful that an average member of the public would notice if a handgun strapped to a stranger's waist was missing serial numbers.  *See* Gov. Supp. Br. 14 (explaining that "the presence of a serial number does not impair the use or functioning of a weapon in any way"); *Price*, 2022 WL 6968457, at *6 ("The mechanics of the firearm—with or without a serial number—are the same.").  Unserialized firearms, therefore, are not "dangerous and unusual" weapons.

An analogy to *Rahimi* reinforces this conclusion.  In *Rahimi*, government argued that a person subject to a domestic violence restraining order was not "a law abiding, responsible citizen" and thus fell within one of the non-exhaustive list of longstanding limitations on the Second

16

Amendment that *Heller* and *Bruen* said they were not disturbing. *Rahimi*, 61 F.4th at 451-52. The Fifth Circuit disagreed. It explained that *Heller* and *Bruen* excluded from the Second Amendment's scope two categories of dangerous citizens: felons and the mentally ill. *Id.* at 452; *see also id.* at 452 n.6 (leaving open the possibility that defendants under indictment also fall into this group). Since Rahimi fell into neither group, he was protected by the Second Amendment. *Id.*; *Connelly*, 2023 WL 2806324, at *5 (reaching the same conclusion for defendant who was an unlawful drug user). It might have been good policy to keep firearms out of the hands of those with domestic violence restraining orders, but that did not mean the Second Amendment allowed it. *Id.* at 461.

This Court should follow the same approach here. Just as *Heller* and *Bruen* did not purport to give an exhaustive list of "law abiding, responsible citizens" in its *dicta* about presumptively lawful regulations, those opinions did not purport to give an exhaustive list of "dangerous and unusual" arms either. But that does not mean courts can run out and add to the list whatever guns they think should be banned as a matter of policy. Just like the Circuit in *Rahimi* hued closely to the categories of citizens *Heller* labeled as non-law-abiding, this Court should hew closely to the types of weapons *Heller* acknowledged could be banned: M-16 and other military-style weapons, as well as short barrel shot guns. Unserialized firearms plainly are not like those guns. Therefore, they remain protected.

> **b. Section 922(k) is not a commercial regulation.**

The government claims § 922(k) is lawful because it is a commercial regulation and *Heller* said that commercial regulations are categorically lawful. *See* Gov. Br. 13. As is the case for the "in common use" *dicta*, *Heller*'s *dicta* about "laws imposing conditions and qualifications on the commercial sale of arms" should be considered at *Bruen*'s second step, not its first.

More fundamentally, though, § 922(k) simply "is not a commercial regulation." *Price*, 2022 WL 6968457, at *3. "18 U.S.C. § *923(i)* is the commercial regulation that requires manufacturers to place serial numbers on firearms." *Id.* (emphasis added). Section 922(k), on the other hand, "criminalizes the mere possession of a firearm after a serial number is removed, obliterated, or altered in any way, whether or not the firearm is then placed into commerce." *Id.* Because § 922(k) is a "blatant prohibition on possession," it "falls squarely within the Second Amendment's plain text." *Id.*; *see also Rahimi*, 61 F.4th at 454 ("The [Second] amendment grants . . . the right 'to keep' firearms, and 'possession' is included within the meaning of 'keep.'").

In any event, numerous courts have held that laws regulating the manufacture and commercial sale of firearms are not categorically excluded from the Second Amendment's protection.[5] Courts can and do strike down regulations affecting the sale of firearms for violating the Second Amendment. Recently, two district courts in California enjoined a state law forbidding the sale of new handgun models without a feature called "microstamping," which imprints an array of characters onto a bullet cartridge and allows the police officers to identify the make, model, and serial number of a handgun used at a crime scene off the cartridge. *See Boland v. Bonta*, 2023 WL 2588565, at *1, *4-*6 (C.D. Cal. Mar. 20, 2023); *Renna v. Bonta*, No. 20-CV-2190-DMS-DEB, 2023 WL 2846937, at *1-*2, 9-*10 (S.D. Cal. Apr. 3, 2023). The parallels between that

---

[5] *United States v. Marzzarella*, 614 F.3d 85, 92 n.8 (3d. Cir. 2010) ("If there were somehow a categorical exception for [commercial sales] restrictions, it would follow that there would be no constitutional defect in prohibiting the commercial sale of firearms. Such a result would be untenable under *Heller*."); *Pena v. Lindley*, 898 F.3d 969, 1007 (9th Cir. 2018) (Bybee, J., concurring) ("The Supreme Court in *Heller* could not have meant that anything that could be characterized as a condition and qualification on the commercial sale of firearms is immune from more searching Second Amendment scrutiny."); *Rigby v. Jennings*, 2022 WL 4448220, at *8 (D. Del. Sept. 23, 2022) ("[T]he right to keep and bear arms implies a corresponding right to manufacture arms" because "the right to keep and bear arms would be meaningless if no individual or entity could manufacture a firearm").

microstamping requirement and § 922(k)'s serial number requirement are obvious.

  **c. Section 922(k) does not infringe on the right to bear arms.**

  The government also claims that § 922(k) does not meaningfully burden Second Amendment conduct because serialization does not affect firearm functionality and individual self-defense can still be exercised using legal, serialized firearms. *See* Gov. Supp. Br. 13-14. Whether or not that is true, it is not the constitutional test.

  In *Heller*, the District of Columbia had banned handgun possession but not long gun possession. *Heller*, 554 U.S. at 629. Still, the Supreme Court struck that handgun ban down. "It is no answer" under the Second Amendment "to say . . . that it is permissible to ban the possession of [one type of gun] so long as the possession of other firearms [] is allowed." *Id.*; *see also Friedman v. City of Highland Park, Ill.*, 136 S. Ct. 447, 448 (2015) (Thomas, J. dissenting from denial of certiorari) (explaining that assault weapons bans cannot be justified by the fact that "law abiding citizens retain adequate means of self-defense" because other types of firearms are still available). "[T]he infringement on a constitutional right in one way is not typically negated by the fact that the Government did not violate the same right even further in another way." *United States v. Kelly*, 2022 WL 17336578, at *3 (M.D. Tenn. 2022). "We would never say the police may seize and keep printing presses so long as newspapers may replace them, or that they may seize and keep synagogues so long as worshippers may pray elsewhere." *Frein v. Pennsylvania State Police*, 47 F.4th 247, 250 (3d Cir. 2022) (rejecting government's argument that seizure of parents of murder convict's guns did not violate the Second Amendment because they could retain or acquire other firearms).

  Indeed, in the California microstamping cases, the district courts held that "the fact that Californians may purchase other firearms—including long guns or single-shot guns . . . , outdated

[] handguns, or [state-of-the-art] handguns on the secondary market—does not mean that the Second Amendment does not cover their proposed conduct of purchasing state-of-the-art handguns on the primary market." *Boland*, 2023 WL 2588565, at *6; *see also Renna*, 2023 WL 2846937, at *7 n.8.  Same here.  The fact that § 922(k) does not prohibit Mr. Merriman from possessing serialized guns does not mean that the Second Amendment does not cover his possession of an unserialized gun too.  In fact, this case is easier than the California cases because § 922(k) regulates possession, not just sale.

However you slice it, § 922(k) regulates conduct that falls within the Second Amendment's plain text, and accordingly it is presumptively unconstitutional.  Mr. Merriman's motion clears Step One.

### 3.   *Bruen* Step Two:  The government fails to meet its burden to demonstrate that § 922(k) is consistent with the Nation's tradition of firearm regulation.

*Bruen* set out two different standards for deciding whether a challenged regulation is consistent with historical firearm regulation: whether the regulation is "distinctly similar" or "relevantly similar."  Here, the government needs to point to a "distinctly similar" regulation because § 922(k) addresses a problem that has been around since the founding.  It has failed to do so.  Plus, even assuming the "relevantly similar" standard applies, the government has still not met its burden.  The historical laws it points to do not have the same "how" and "why" as § 922(k).  Thus, § 922(k) fails at *Bruen* Step Two.

#### a.   The government has failed to meet its burden to point to a "distinctly similar" historical regulation.

Section 922(k) is designed to address a problem that has existed since the time of the founding: tracing lost or stolen firearms and solving the crimes, if any, committed with them.[6]

---

[6] *See Price*, 2022 WL 6968457, at *5 ("It is difficult to imagine that this societal problem [of tracing firearms and solving gun crime] did not exist at the founding. While firearms then were

Even the district courts that have refused to strike down § 922(k) have recognized this fact.  *See, e.g.*, *United States v. Holton*, 2022 WL 16701935, at *5 (N.D. Tex. Nov. 3, 2022) (explaining that the founders were concerned with "illegal trading and trafficking of arms and ammunition" and "controlling and tracing the sale of firearms"); *United States v. Serrano*, 2023 WL 2297447, at *13 (S.D. Cal. Jan. 17, 2023) (similar).

The technology for impressing identifying markings into guns has existed since the founding too, as the "barrel proofing" statutes cited by the government demonstrate.  *See* Gov. Supp. Br. 17-18.  Since as early as the 17th century, firearm manufacturers have been impressing markings into the barrels and locks of guns to indicate all sorts of things—who made them, where, and whether the gun had been tested and found safe.[7]  Had the founders wanted to require something akin to firearm serialization, they certainly could have.

Because the problems addressed by § 922(k) have existed since the founding and are not the product of a dramatic technological change, the appropriate analogical inquiry is under *Bruen*'s "distinctly similar" standard.  The "distinctly similar" inquiry asks whether "the Founders themselves could have adopted" the regulation at issue.  *Bruen*, 142 S. Ct. at 2131.  If they did not do so, and in particular if they addressed the societal problem by "materially different means," that is evidence that the regulation is unconstitutional.  *Id.*; *Hicks*, 2023 WL 164170, at *6-*7 (rejecting analogy between state surety laws and law prohibiting transfer of firearms to those under indictment because they addressed "the same societal fear . . . but used materially different

---

not the same as firearms today, there certainly were gun crimes that might have been more easily investigated if firearms had to be identifiable by a serial number or other mark.").

[7] *See* PBS, History Detectives – Gun Timeline, https://www.pbs.org/opb/historydetectives/technique/gun-timeline/ (listing 1637 as the first year proof-marks were used); Major H.B.C. Pollard, *A History of Firearms* 47 (1926) (explaining that "proof marks" from English gun manufacturers "are found on the barrels of many 17th century pieces" and "the name of the maker and the town of origin . .  is often found on the barrel and lock").

means"); *Holden*, 2022 WL 17103509, at *4 (same).

The government has not argued that the founders required guns be affixed with serial numbers, even though the technology to do so was available at the time.  Instead, founding-era governments addressed the problem of controlling and tracing the sale of firearms "by different means."  *Holton*, 2022 WL 16701935, at *5.  Accordingly, this Court should hold that § 922(k) is unconstitutional.

### b.  The government has failed to meet its burden to point to a "relevantly similar" historical regulation too.

Even if the more relaxed "relevantly similar" test were to apply, the government would still lose.  Section 922(k) burdens the Second Amendment by prohibiting possession of a particular class of firearms: unserialized guns.  The ban applies to every citizen.  The penalty for violating that ban is a criminal conviction and (in almost every case) incarceration.  This is the "how" of § 922(k).  The "why"?: to "allow[] authorities to recover stolen firearms and trace firearms that have been used in a crime."  Gov. Supp. Br. 19.  None of the historical regulations cited by the government share this combination of features or anything analogous to them.[8]

### i.  Commercial Regulations

The government begins its Step Two argument by citing a grab bag of commercial restrictions on firearms from the founding era: laws in three states taxing personally held firearms, a Virginia law requiring guns to be recorded upon arrival to the colony, laws in two states prohibiting residents from selling firearms outside the colony, and laws prohibiting the sale of

---

[8] The government's brief lumps different categories of firearm regulations together and analyzes them collectively.  *See generally* Gov. Br. 14-20.  This is inconsistent with the method of analysis used in *Rahimi*, which evaluated different categories of firearm regulations individually.  *See Rahimi*, 61 F.4th at 456-60.  Mr. Merriman's analysis follows the *Rahimi* method.

firearms to Native Americans.  *See* Gov. Br. 14-15.  These laws bare essentially no relationship to § 922(k) and fail to meet the "relevantly similar" standard.  In fact, most fail to establish a tradition of firearm regulation at all.

**Taxing firearms:**  The government's brief says that "three southern states" imposed taxes on personally held firearms.  Gov. Br. at 15.  Regulations in three states, however, are not enough to establish a national tradition of firearm regulation.  *See Bruen*, 142 S. Ct. at 2142 ("[W]e doubt that three colonial regulations could suffice to show a tradition of public carry regulation."); *Rahimi*, 61 F.4th at 458 (citing *Bruen* for the same).

Plus, the "how" and "why" of these laws are completely different from § 922(k).  Taxing firearms is not the same as banning them.  *Cf. Rahimi*, 61 F.4th at 458, 460 (rejecting as inapposite to § 922(g)(8) any law that did not result in the forfeiture of the right to possess firearms); *Hicks*, 2023 WL 164170, at *7 (rejecting as inapposite any laws that did not also ban receiving firearms); *Holden*, 2022 WL 17103509, at *4 (same); *Stambaugh*, 2022 WL 16936043, at *5 (same).  And the purpose of taxation is typically revenue generation, while the purpose of § 922(k) is to trace lost firearms and solve crimes.  *See Rahimi*, 61 F.4th at 457, 459 (rejecting as inapposite historical laws that did not share the same purpose as the challenged regulation).  Thus, laws taxing firearms at the founding are not "relevantly similar" to § 922(k).

**Recording firearms:**  The government identifies only one law, from Virginia, requiring the recording of firearms of new arrivals to the colony. Gov. Br. 15.  This cannot establish a national tradition of firearm regulation either.  *See Rahimi*, 61 F.4th at 458 ("[O]ne outlier [law] is not enough to show a tradition of [firearm] regulation.").

Furthermore, the "how" of that law is different to § 922(k).  Requiring someone to record their possession of a (inevitably unserialized) firearm is not the same thing as banning possession

of it altogether.  The "why" of this Virginia law might be analogous to 922(k),[9] but that is not enough to make it "relevantly similar" to § 922(k).  *See Rahimi*, 61 F.4th at 459-60 (rejecting as inapposite laws where the "why" was analogous but the "how" was different).  Laws that achieve the same objective by materially different means are not analogous.  *See Hicks*, 2023 WL 164170, at *6-*7; *Holden*, 2022 WL 17103509, at *4.

**Prohibitions on the sale of firearms outside the colony:**  The government identifies two laws purportedly restricting the sale of firearms outside the colony.  Gov. Br. 15 (mentioning laws from Connecticut and Virginia).  Again, this cannot establish a national tradition of firearm regulation.  *See Bruen*, 142 S. Ct. at 2142; *Rahimi*, 61 F.4th at 458. [10]

Regardless, these laws were restrictions on sale and not, like § 922(k), possession.  *See Price*, 2022 WL 6968457, at *6 (holding that "evidence of historical commercial regulations is . . . inapposite" because § 922(k) is not a commercial regulation).  And they applied to a more limited class of people (those outside the colony) than § 922(k) (everyone).  They are inapposite too.

**Prohibits on sales of firearms to Native Americans:**  The government identifies six colonies that had laws banning the sale of firearms to native Americans.  *See* Gov. Br. 15.  Putting aside the obvious problems with relying on these types of racist laws as precedent, *see, e.g.*, *Hicks*, 2023 WL 164170, at *6, these laws are not analogous to § 922(k) either.  Again, these are

---

[9] *See Holton*, 2022 WL 16701935, at *5 (suggesting that the purpose of this Virginia law was to "control[] and trac[e] the sale of firearms").

[10] *See also, e.g.*, *Antonyuk v. Hochul*, 2022 WL 16744700, at *75 (N.D.N.Y. 2022) ("Those four restrictions (in race courses, circuses, ball rooms and saloons) appear to be what the [*Bruen*] Supreme Court would find to be 'outliers.'") (cleaned up); *United States v. Harrison*, No. CR-22-00328-PRW, 2023 WL 1771138, at *23 (W.D. Okla. Feb. 3, 2023) ("Two laws in place during time of war hardly demonstrate a course of consistent practice sufficient to establish a constitutionally significant tradition."); *Koons v. Reynolds*, No. CV 22-7464 (RMB/EAP), 2023 WL 128882, at *13, *15 (D.N.J. Jan. 9, 2023) (rejecting reliance on outlier statutes); *Christian v. Nigrelli*, No. 22-CV-695 (JLS), 2022 WL 17100631, at *8 (W.D.N.Y. Nov. 22, 2022) (same).

restrictions on sale, not possession. *See Price*, 2022 WL 6968457, at *6. The "why" of these regulations is different too. The purpose of laws disarming Native Americans "was ostensibly the preservation of political and social order" and the prevention of "armed rebellion." *Rahimi*, 61 F.4th at 457. The purpose of § 922(k) was to trace lost firearms and solve crimes.

In short, none of these laws are "relevantly similar" to § 922(k).

### ii. Gunpowder laws

Next, the government attempts to draw an analogy between § 922(k) and gunpowder regulatory schemes enacted in Rhode Island, New Jersey, Pennsylvania, Massachusetts, and New Hampshire between 1776 and 1830. *See* Gov. Supp. Br. 15-16. This fails too.

The historical gunpowder laws cited by the government authorized the appointment of inspectors of gunpowder; regulated the composition of gun powder manufactured; specified what characteristics rendered powder to be "in proof"—meaning of conforming composition, safely storable and safely salable; prohibited the sale of deficient powder; limited the quantities of gunpowder which could be possessed or stored in a given location; and generally required licenses to sell or otherwise transfer gunpowder within certain jurisdictions. *See* 8 *Records of the State of Rhode Island and Providence Plantations in New England* 18-19 (1863); *New Jersey Session Laws Online, Acts of the General Assembly of the State of New-Jersey, Legislature Number 1* at 6-7; 3 *Laws of the Commonwealth of Pennsylvania, from the Fourteenth Day of October, One Thousand Seven Hundred* 240-44 (1810); 2 *General Laws of Massachusetts from the Adoption of the Constitution to February 1822* at 199-200 (1823); *Laws of the State of New Hampshire; with the Constitutions of the United States and of the State Prefixed* 276-78 (1830). As a part of this safety inspection framework, these laws required gunpower manufacturers and inspectors to label gunpower casks with markings indicating who made the gunpowder and that the gunpowder had

been inspected and found safe (or if not, that it was "condemned"). *See id.* Gunpowder inspectors, manufacturers, and retailers who did not comply with these laws risked fines ranging from 50 cents to $500 and forfeiture of the non-compliant gunpowder. *See id.* Notably, these laws do not appear to have prohibited downstream gunpowder purchasers from storing the gunpowder separately from the required markings on the gunpowder casks or removing the marking from the casks all together. *See id.* [11]

These laws are different from § 922(k) in both "why" and "how." As discussed earlier, *Rahimi* provides an excellent illustration of the tightness of fit required for the "why" of historical regulations to be analogous to the "why" of a challenged statute. In *Rahimi*, only the state surety laws were close enough to § 922(g)(8) because both were designed to protect identified people from the threat of violence posed by a specific person. *Rahimi*, 61 F.4th at 459-60 & n.10. Laws targeted at curbing riotous behavior and those that disarmed Native Americans and other supposedly "disloyal" groups, all of which were aimed at preventing violence more generally, were not. *See Rahimi*, 61 F.4th at 459 (rejecting analogy to going armed laws because there were aimed at "disarming those who had been adjudicated a threat to society generally, rather than identified individuals"); *id.* at 457 (rejecting analogy to laws disarming Native Americans, slaves, and those unwilling to swear an oath of allegiance because those laws were designed to preserve the "political and social order" and "prevent armed rebellions"). As a judge in the Western District of Texas explained following *Rahimi*, laws with justifications that "differ[] slightly" from the challenged law are not relevantly similar. *Connelly*, 2023 WL 2806324, at *11.

---

[11] The only states' laws that come anywhere close are Massachusetts and New Hampshire, which were focused on prohibiting the sale of condemned gunpowder but whose text about defacing inspection markings arguably swept more broadly. *See Gen. Laws of Mass.*, *supra*, at 199-200; *Laws of N.H.*, *supra*, at 277-78. Two states' regulations, however, do not establish a historical "tradition" of firearm regulation. *See supra* 23-24 & n.10.

Here, the analogy between the purposes of gunpowder laws and § 922(k) is even weaker. The cited gunpowder laws transparently regulated commerce as a matter of consumer and product safety. *See, e.g.*, Gov. Supp. Br. 19 (describing how the laws were "designed to protect citizens from explosions" and "to allow unsafe . . . powder to be traced to the inspector who first affixed the markings."). Section 922(k), on the other hand, requires marking and serialization procedures to aid in solving violent gun crimes and finding stolen guns. These two purposes are nothing alike. For that reason alone, these gunpowder laws are not relevantly similar to § 922(k).

The "how" is different too. Other than the fact that these regulations both required markings, they bear very little similarity to one another. To state the obvious: the laws highlighted by the government regulated gunpower, not firearms. They also sought to regulate gunpowder manufacturers, retailers, and inspectors—not, as with § 922(k), the end firearm user. *Cf. Rahimi*, 61 F.4th at 457 (distinguishing laws concerning Native Americans and other purportedly disloyal groups from § 922(g)(8), which regulated those that were a purported threat to individually identified people); *Connelly*, 2023 WL 2806324, at *11 (distinguishing laws that disarmed different groups—dangerous individuals vs. drug users who might or might not be dangerous). The penalties associated with these offenses are very different too. These gunpowder laws imposed fines. Section 922(k) is a criminal statute authorizing the court to sentence a defendant to up to five years in prison. *See* 18 U.S.C. § 924(a)(1)(B). *Cf. Rahimi*, 61 F.4th at 458 (rejecting analogy to law where the "penalty" was different). The gunpowder laws are not analogous to § 922(k) either.

### iii.  Barrel Proofing Laws

Finally, the government maintains that two "barrel proofing statutes" enacted by Maine and Massachusetts—in 1805 and 1821 respectively—demonstrate a historical tradition of firearm

regulation which would support the constitutionality of § 922(k).  Laws in two lone states, however, do not establish a national tradition of firearm regulation.  *See Bruen*, 142 S. Ct. at 2142; *Rahimi*, 61 F.4th at 458; *supra* n.10.[12]

Regardless, the "why" and "how" of these statutes are different too.  First, a bit of background.  "Barrel proofing" was a type of musket and pistol barrel-function testing, where appropriate sized ammunition was overloaded with powder in the gun on purpose.[13]  Discharging the gun with the overloaded powder produced higher than normal pressures inside the barrel.  *See supra* n.13.  If the barrel as constructed could withstand the increased pressures from the overloaded discharge, it was expected to withstand the significantly lower pressures of non-overloaded discharges that occurred with regular use. *See id.*  Proofing barrels either worked or failed. *See id.*  For those that worked and passed the "proofing" process, the barrels were affixed with a stamp that gave notice of the identity of who proofed the barrel and that it had been safely proofed to work as intended.  *See id.*  Barrel proofing started being used by English gunsmiths during the 1630s.[14]  The United States historically had no formal proofing houses (like European

---

[12] According to the 1820 census, Maine and Massachusetts accounted for a combined total of only 8.5% of the U.S. population.  U.S. Census for 1820 at 18 (listing population of Main as 298,335, population of Massachusetts as 523,287, and total U.S. population as 9,625,734). "[A] handful of . . . enactments involving a small minority of jurisdictions governing a small minority of population" are insufficient to establish a tradition under *Bruen.  Spencer v. Nigrelli*, 2022 WL 17985966, at *12 (W.D.N.Y. 2022); *Hardaway v. Nigrelli*, No. 22-CV-771 (JLS), 2022 WL 11669872, at *15 (W.D.N.Y. Oct. 20, 2022) (same).

[13] *See* Joel Penkala, *The Barrel Proofing Process*, Shotgun Craftsmanship, Upland Gun Company (March 2, 2021), https://uplandguncompany.com/the-barrel-proofing-process/; George Harris, *What Does It Mean to Proof a Firearm?*, NRA Shooting Illustrated.com (Nov. 29, 2020), https://www.shootingillustrated.com/content/what-does-it-mean-to-proof-a-firearm/ (last viewed Feb. 3, 2023).

[14] *See e.g.* The Proof House, Worshipful Company of Gunmakers, https://www.gunmakers.org.uk/the-proof-house/.

countries), so most U.S. manufacturers today voluntarily proof their own firearms.[15]  In 1805 and 1821, as the government points out, Massachusetts and Maine passed laws requiring barrel proofing.  *See* Gov. Supp. Br. at 17-18 (citing *Laws of the Commonwealth of Massachusetts from November 28, 1780, to February 28, 1807*, at 259 (1807) and *Laws of the State of Maine* 546 (1830)).  These laws imposed fines for selling guns without proofing marks and altering any proofing marks that had been affixed.  *See id.*

Like the gunpowder laws, barrel proofing and barrel proofing marks were consumer product safety measures adopted to protect firearm end-users and to improve firearm safety.  *See Laws of the Commonwefalth of Massachusetts*, *supra*, at 259 (explaining that the law was adopted to prevent the introduction of firearms "into use which are unsafe, and thereby lives of the citizens be exposed"); Gov. Supp. Br. 19 (explaining that these laws were "designed to protect citizens from explosions and to allow unsafe barrels . . . to be traced to the inspector who first affixed the markings").  As a result, barrel proofing statutes were not "comparably justified" to § 922(k), which is intended to facilitate crime-solving.  Plus, as with the gunpowder regulations, the penalties associated with violating barrel proofing laws were very different.  These barrel proofing statues imposed fines, not jail time.  And they banned removal of those markings rather than, as with § 922(k), possession knowing the markings had been removed.  In this case, for example, Mr. Merriman is not alleged to have removed the serial number from his handgun himself.  *See* Dkt. 4.

In conclusion, none of the statutes cited by the government are "relevantly similar"—much less "distinctly similar"—to § 922(k)'s prohibition against possessing unserialized firearms.  Using either *Bruen* inquiry, there is no fit—much less the necessary tight fit—between § 922(k)

---

[15]  *See* NRA Museum, *Proof Mark Registry*, https://www.nramuseum.org/media/940944/proofmarks.pdf.

and the collection of statutes presented by the United States.  The government has failed to carry

its burden.  Section 922(k) is unconstitutional.

## CONCLUSION

For the reasons stated above, this Court should dismiss the indictment.  Mr. Merriman

respectfully requests oral argument.

Respectfully Submitted,

MARJORIE A. MEYERS
Federal Public Defender
Southern District of Texas
Texas State Bar No. 14003750
Southern District of Texas No. 3233

By: /s/ CARLOS M. ALANIZ
CARLOS M. ALANIZ
Assistant Federal Public Defender
Texas State Bar No. 24009081
Southern District of Texas No. 27460
1202 Houston St.
Laredo, Texas 78040
Telephone:956/753-5313
Fax: 956/753-5317

COURTNEY L. MILLIAN
Assistant Federal Public Defender,
Appellate Division
District of Columbia Bar No. 1659911
440 Louisiana, Suite 1350
Houston, Texas 77002
Telephone: 713.718.4600
Fax: 713.718.4610

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on May 12, 2023, I served a true and correct copy of Defendant's Supplemental Brief in Support of Defendant's Motion to Dismiss in the above-captioned case, via the Court's E-noticing system and email to Government's counsel, Mr. Gerard Cantu, Assistant United States Attorney.

By:  <u>/s/ CARLOS M. ALANIZ</u>
      CARLOS M. ALANIZ
      Assistant Federal Public Defender