IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
LAREDO DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| V. | § | CR. NO. L-22-CR-1439 |
| MARSHALL STEVE MERRIMAN | § | |

### NOTICE OF SUPPLEMENTAL AUTHORITY IN SUPPORT OF DEFENDANT MERRIMAN'S MOTION TO DISMISS

Mr. Merriman hereby submits this supplemental authority in support of his Motion to Dismiss (ECF No. 18), alerting the Court to two major developments in circuit case law addressing the constitutionality of firearm regulations following *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022).

A. *Teter v. Lopez* (9th Cir.)

On August 7, 2023, the Ninth Circuit decided *Teter v. Lopez*, No. 20-15948, 2023 WL 5008203 (9th Cir. Aug. 7, 2023), which held that Hawaii's ban on butterfly knifes was unconstitutional after *Bruen*. Its reasoning is instructive.

In *Teter*, the Attorney General of Hawaii argued that its state's butterfly knife ban was constitutional because butterfly knifes were not "arms" within the meaning of the Second Amendment. The Circuit rejected this argument:

> In [*District of Columbia v.*] *Heller*, the Supreme Court held that a handgun was an "arm" within the meaning of the Second Amendment. 554 U.S. [570,] 581, 628–29 [(2008)]. In reaching that conclusion, the Court began by noting that, as a general matter, the "18th-century meaning" of the term "arms" is "no different from the meaning today." *Id.* at 581. Then, as now, the Court explained, the term generally referred to "[w]eapons of offence, or armour of defence." *Id.* (cleaned up). The Court further noted that all relevant sources of the original public

> meaning of "arms" agreed that "all firearms constituted 'arms' " within the then-understood meaning of that term. *Id.*
>
> * * *
>
> We similarly conclude that, just as with firearms in *Heller*, bladed weapons facially constitute "arms" within the meaning of the Second Amendment. Like firearms, bladed weapons fit the general definition of "arms" as "[w]eapons of offence" that may be "use[d] in wrath to cast at or strike another." *Id.* (cleaned up).

*Teter*, 2023 WL 5008203, at *8. Mr. Merriman's case is even easier. And unserialized firearm is still a firearm. Serial number or not, it can be used as a "weapon[] of offen[s]e . . . to cast at or strike another." *Id.*

*Teter* also rejected the Hawaiian government's argument that, because butterfly knives are purportedly "dangerous and unusual," they are not "arms" as that term is understood in the Second Amendment. The Ninth Circuit explained that "*Heller* itself stated that the relevance of a weapon's dangerous and unusual character lies in the 'historical tradition of prohibiting the carrying of dangerous and unusual weapons.'" *Id.* (quoting *Heller*, 554 U.S. at 627). "It did not say that dangerous and unusual weapons are not *arms*." *Id.* (emphasis in original). Mr. Merriman made this same point in his briefing. *See* Merriman Supp. Br. 12. Thus, government bears the burden to prove that unserialized firearms are dangerous and unusual at *Bruen*'s second step. *Teter*, 2023 WL 5008203, at *8.

The Ninth Circuit then went on to rejected Hawaii's argument that butterfly knives have "uniquely dangerous propensities" or not "in common use." A butterfly knife, the Circuit noted, is not uniquely dangerous because it is "simply a pocketknife with an extra rotating handle." *Id.* at *9. It also meets the "common use" standard because it can be used for self-defense, and the government relied on nothing but conclusory statements (from the statute's legislative history in

2

1999) to prove that butterfly knives were associated with criminal activity at the time the law outlawing them was passed. *Id.* at *9, *12.

Unserialized firearms present an even easier example. Serialized and unserialized guns work identically. *See* Gov. Supp. Br. 14 (explaining that "the presence of a serial number does not impair the use or functioning of a weapon in any way"); *Price*, 2022 WL 6968457, at *6. For that reason, they can also both be used for self-defense. And, as in *Teter*, the government has relied on nothing but conclusory statements to support its suggestion that unserialized firearms are not commonly used for self-defense or other lawful purposes.[1]

The government's "common use" argument has other problems too. Firearms were not serialized at the founding, even though the technology to stamp them existed at the time. *See* Merriman Supp Br. 14-15. Unserialized firearms were, therefore, commonly used for lawful purposes at the founding. The government has not suggested otherwise, nor has it suggested that unserialized firearms were not commonly used for lawful purposes *until after* the government made it illegal to acquire them during the 20th century.

In *Teter*, the Hawaiian government at least tried to justify its decision to ban butterfly knives based on the perception that they were used by non-law-abiding citizens (gangs) before it outlawed them. 2023 WL 5008203, at *9 (relying on legislative history). The government has not

---

[1] *See* Gov. Supp. Br. 10 ("Common sense . . . dictates that there is no 'law abiding' reason to knowingly possess a firearm with an obliterated serial number."); *see also id.* (citing David M. Kennedy, et al., *Youth Violence in Boston: Gun Markets, Serious Youth Offenders, and a Use-Reduction Strategy*, 59 Law & Contemp. Probs. 147, 174-75 (Winter 1996) (which claims, in conclusory statements, that the only reason to obliterate a serial number is to avoid being connected with a firearm that was stolen, involved in a crime, or obtained in a straw purchase obliterated serial number.); *see also id.* at 12 (citing speculation from *United States v. Marzzarella*, 614 F.3d 85 (3rd Cir. 2010)).

done that here.² Instead, it has claimed that, *after* it made possessing unserialized firearms illegal, law-abiding people don't possess them. That is entirely circular. That reasoning also leads to absurd results. If the government is right, then the "common use" requirement effectively freezes prohibitions on classes of firearms to whatever happened to be illegal when *Bruen* was decided. *Bruen*, it bears emphasizing, was a decision foregrounding originalism and the intent and understanding of the founding founders. It defies logic to think that decision is properly understood to ossify firearm regulation to whatever happened to be legal in 2022, because law abiding people in 2022 do not do what is illegal in 2022.³ Particularly when, as here, the prescribed firearms were legal at the time of the founding.

B. *United States v. Daniels* (5th Cir.)

On August 9, 2023, the Fifth Circuit decided *United States v. Daniels*, No. 22-60596, 2023 WL 5091317 (5th Cir. Aug. 9, 2023), which held that section 922(g)(3)'s ban on firearm possession by unlawful drug users was unconstitutional as applied to a regular user of drugs (specifically, marijuana) who was sober at the time he was found to have possessed the gun.

*Daniels* clarifies several aspects of the Fifth Circuit's Second Amendment jurisprudence. As noted in Mr. Merriman's supplemental brief, *Bruen* set out two conceptual pathways by which the government's historical evidence can be evaluated at *Bruen* Step Two, but the Fifth Circuit's opinion in *Rahimi* muddied the doctrinal waters by eliding the difference between the two.

---

² Mr. Merriman maintains his position from his briefing that the fact unserialized firearms were commonly used at the founding is enough to satisfy any common use requirement. *See* Merriman Supp. Br. 13-14. He emphasizes the government's failure to show that unserialized firearms were not in common use for lawful purposes at the time it enacted the serialization requirements only to further underscore the absurdity of the government's position.

³ Under this logic, if *Bruen* had been decided in the 1990s during the federal assault weapons ban, new semi-automatic weapons could be banned. But because, it was decided in 2022, when the ban had lapsed, they cannot be. Again, that defies logic.

Merriman Supp. Br. 8-9. *Daniels* reaffirms the doctrinal difference: If the problem addressed by a challenged law is "a general societal problem that has persisted since the 18th century," the government must point to "distinctly similar" historical regulation. 2023 WL 5091317, at *3. If the problem is novel, however, the government need only point to "relevantly similar" regulation. *Id.* As explained in Mr. Merriman's briefing, the "distinctly similar" test applies here because tracking firearms and solving gun crime were problems that existed at the founding and the technology to stamp firearms existed too. Merriman Supp. Br. 20-23. But he wins under either test. *Id.* at 20-29.

*Daniels* also adds further support to Mr. Merriman's point about how this Court should think about dicta from *Heller* and *Bruen*. As in *Rahimi*, the government in *Daniels* argued that the defendant could be categorically disarmed because *Bruen* and *Heller*, in dicta, referred to the Second Amendment right as belonging to "law abiding citizens." *Daniels* rejected this argument: "[W]hen *Heller* and *Bruen* used the phrase 'law-abiding,' it was just 'short-hand' to 'exclude from the . . . discussion' the mentally ill and felons," people who *Heller* expressly said "were historically 'stripped of their Second Amendment rights.'" *Daniels*, 2023 WL 5091317, at *4. "All others are presumptively included in the Second Amendment's ambit." *Id.* Because *Daniels* was not a felon or mentally ill, he had presumptive Second Amendment rights. *Id.*

The same analytical pathway applies to the Supreme Court's dicta about guns being "in common use" or "dangerous and unusual." Just like the Circuit in *Rahimi* and *Daniels* understood the "law-abiding citizens" dicta by reference to the categories of person *Heller* said could be disarmed (felons and the mentally ill), the "in common use" / "dangerous and unusual" dicta should be understood by reference to the examples of guns *Heller* said could be banned: M3 automatic weapons and sawed off shot guns. *See* Merriman Supp. Br. 15-17. Because guns without serial

5

numbers, as a class, are not like M3 automatic weapons or sawed off shot guns, and instead are functionally identical to weapons we all understand to be protected by the Second Amendment, guns without serial numbers are presumptively protected too. *See id.*; *cf. Daniels*, 2023 WL 5091317, at *10 (ruling in the defendant's favor at Step Two because he was more like a repeat alcohol user, who could have a gun, than a mentally ill person, who could not).

For these reasons, and the additional reasons set out in Mr. Merriman's briefing, he respectfully requests that his motion to dismiss be granted.

        Respectfully submitted,

        MARJORIE A. MEYERS
        Federal Public Defender
        Southern District of Texas
        Texas State Bar Number 14003750
        Southern District of Texas No. 3233

        By: /s/ CARLOS M. ALANIZ
        CARLOS M. ALANIZ
        Assistant Federal Public Defender
        Texas State Bar No.  24009081
        Southern District of Texas No. 27460
        1202 Houston St.
        Laredo, Texas 78040
        Telephone: 956-753-5313
        Fax: 956-753-5317

        COURTNEY L. MILLIAN
        Assistant Federal Public Defender
        Appellate Division
        District of Columbia Bar No. 1659911
        440 Louisiana, Suite 1350
        Houston, Texas 77002
        Telephone: 713-718-4600
        Fax: 713-718-4610

## **CERTIFICATE OF SERVICE**

I certify that on August 16, 2023, a copy of the foregoing Notice of Supplemental Authority was served by Notification of Electronic Filing and was delivered by email to counsel for the government.

/s/ CARLOS M. ALANIZ
CARLOS M. ALANIZ