United States District Court
Southern District of Texas
**ENTERED**
October 16, 2023
Nathan Ochsner, Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
LAREDO DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| VS. | § | CRIMINAL ACTION NO. 5:22-CR-1439 |
| | § | |
| MARSHALL STEVE MERRIMAN | § | |
| | § | |

## REPORT AND RECOMMENDATION OF
## THE UNITED STATES MAGISTRATE JUDGE

Before the Court is Defendant Marshall Steve Merriman's motion to dismiss the Indictment, whose sole count charges violation of 18 U.S.C. § 922(k). (Dkt. No. 18). United States District Judge Marina Garcia Marmolejo referred the motion to the Undersigned for a report and recommendation pursuant to 28 U.S.C. § 636(b). (Dkt. No. 39). Merriman argues the District Court should dismiss the Indictment because Section 922(k) is unconstitutional under the Second Amendment standard articulated by the Supreme Court in *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022). For the reasons discussed herein, the Undersigned agrees and, therefore, recommends Merriman's motion be **GRANTED**.

## I. BACKGROUND

On October 25, 2022, a criminal complaint was filed against Marshall Steve Merriman. (Dkt. No. 1). The complaint alleges that, on the same date, Merriman approached the United States Border Patrol ("USBP") checkpoint located one (1) mile south of Hebbronville, Texas, on State Highway 16. (*Id.* at 2). There, Merriman was detained and USBP Agents subsequently discovered a Sig Sauer .357 caliber

handgun with an obliterated serial number inside a backpack on the passenger seat of Merriman's vehicle. (*Id.*). When asked about the firearm, Merriman allegedly reported to Special Agents of the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") he received it from a friend three weeks prior. (*Id.*). The Special Agents then asked if Merriman noticed anything out of the ordinary about the firearm, to which Merriman responded the serial number had been polished off. (*Id.*).

Subsequently on November 15, 2022, Merriman was charged with violating 18 U.S.C. § 922(k), which criminalizes possession of a firearm with an obliterated, removed, or altered serial number. (Dkt. No. 12). On December 9, 2022, Merriman filed the instant motion to dismiss the Indictment, arguing Section 922(k) is unconstitutional in light of *New York State Rifle & Pistol Assoc., Inc. v. Bruen*, 142 S. Ct. 2111 (2022). (Dkt. No. 18). On January 19, 2023, the Government filed its response in opposition. (Dkt. No. 22). The District Court then ordered the parties submit supplemental briefings addressing the issues and arguments discussed in *United States v. Rahimi*, 61 F.4th 443 (5th Cir. 2022). (Dkt. No. 28). The parties submitted their respective supplemental briefings, and later Merriman filed an Advisory to the Court and Notice of Supplemental Authority. (Dkt. Nos. 29, 31, 36, 40).

On August 4, 2023, United States District Judge Marina Garcia Marmolejo referred the motion to the Undersigned for a report and recommendation pursuant to 28 U.S.C. § 636(b). (Dkt. No. 39). A hearing ("the hearing") was held before the Undersigned on September 25, 2023. (Min. Ent. Sept. 25, 2023).

## II. LEGAL STANDARD

### A.  Fed. R. Crim. P. 12(b)(3)

The Court assumes that this motion is made pursuant to Rule 12(b)(3) of the Federal Rules of Criminal Procedure, which sets forth certain defects in the indictment that can be brought before the court on a pretrial motion.[1] Fed. R. Crim. P. (12)(b)(3). Pursuant to Fed. R. Crim. P. 12(b)(3)(B), the district court may, at any time during the pendency of a case, hear a defendant's claim that an indictment fails to state an offense or is otherwise defective. *See In re Civil Rights Cases*, 109 U.S. 3, 8-9 (1883). An indictment is defective if it charges a violation of an unconstitutional statute. *Id*. Upon a finding that an indictment is defective, the district court must dismiss the indictment. *Id*.

### B. The Second Amendment

The Second Amendment to the Constitution states, "a well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II.

In *District of Columbia v. Heller*, the Supreme Court held the Second Amendment protects "the right of law-abiding, responsible citizens to use arms in defense of hearth and home." 554 U.S. 570, 635 (2008). In so doing, the *Heller* Court rejected earlier interpretations of the Second Amendment which limited its

---

[1] Merriman states that the motion is brought pursuant to "Federal Rule of Criminal Procedure 12(b)(1)." (Dkt. No. 18 at 2). The Undersigned presumes, based on the substance of the motion, that Merriman brings the motion pursuant to Fed. R. Crim. P. 12(b)(3), which governs motions that must be made before trial and includes alleging that there was "a defect in the indictment or information, including . . . failure to state an offense." Fed. R. Crim. P. 12(b)(3)(B)(v).

application to militia members, finding the Second Amendment guarantees an individual's right to keep and bear arms, unconnected to militia service. *Id*. at 592. The Court reached its conclusion by employing a textual analysis, informed by history. *Id*. at 576-577.

After *Heller*, the Fifth Circuit, like other circuits, applied a two-step inquiry for assessing the constitutionality of firearms restrictions. *Bruen*, 142 S. Ct. at 2126. First, courts would determine whether the regulation fell within the scope of the Second Amendment right, looking to the text and historical tradition to inform their analysis. *United States v. McGinnis*, 956 F.3d 747, 754 (5th Cir. 2020).[2] If the regulation was outside the scope of the Second Amendment, then the law was constitutional. *Id*. If it was inside the scope of the Second Amendment, courts would apply means-end scrutiny to assess its constitutionality. *Id*.

In *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, the Supreme Court declared the two-step inquiry to be "one step too many." *Bruen*, 142 S. Ct. at 2127. Specifically, the *Bruen* Court held this "second step is inconsistent with *Heller*'s historical approach and its rejection of means-end scrutiny." *Id*. at 2130. Providing clarification, the *Bruen* Court reiterated the standard for applying the Second Amendment is as follows:

> "When the second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation.

---

[2] A Fifth Circuit panel abrogated *McGinnis's* finding that § 922(g)(8), is constitutional. *See U.S. v. Rahimi*, 59 F.4th 163 (5th Cir. 2023). It is cited here only to describe the analysis courts applied before *Bruen*.

> Only then may a court conclude that the individual's conduct falls outside the Second Amendment's 'unqualified command.'"

*Id*. at 2129-2130 (quoting *Konigsberg v. State Bar of Cal.,* 366 U.S. 36, 81 (1961). In sum, what the *Bruen* decision adds is an emphasis on "the Second Amendment's text and historical understanding." *Id*. at 2131.

Under *Bruen*, courts considering a constitutional challenge to a firearms regulation must first consider whether it invokes the Second Amendment. *Id*. at 2131. When the Second Amendment's plain text covers the challenged regulation, the Government bears the burden of identifying a "well-established and representative historical analogue" to its regulation. *Id*. Furthermore, "when it comes to interpreting the Constitution, not all history is created equal. Constitutional rights are enshrined with the scope they were understood to have when the people adopted them." *Id*. at 2136. Therefore, to carry its burden, the Government must point to "historical precedent from before, during, and even after the founding [that] evinces a comparable tradition of regulation." *Id*. at 2131-31 (internal quotation marks omitted). However, the Government need not identify a "historical twin"—a historical analogue is sufficient, and "analogical reasoning under the Second Amendment is neither a regulatory straightjacket nor a regulatory blank check." *Id*. at 2133. The core question is whether the challenged law and the proffered analogue are "relevantly similar." *Id*. Two metrics for this analysis are "*how* and *why* the regulations burden a law-abiding citizen's right to armed self-defense." *Id*. at 2133 (emphasis added).

5

In *United States v. Rahimi*, the Fifth Circuit provided insight into how the circuit will apply *Bruen* to Section 922 challenges. 61 F.4th 443, 454 (5th Cir. 2023). In that case the *Rahimi* court considered the constitutionality of Section 922(g)(8), which criminalizes possession of a firearm by a person subject to a domestic violence protective order. Following *Bruen*'s first step, the plain text analysis, the court considered whether Rahimi's conduct, "possession," was included within the meaning of the Second Amendment's use of the word "keep." *Id.* The *Rahimi* court found it was undisputed Rahimi's pistol and rifle were "in common use" at the time of ratification. *Id.* Further, the firearms weren't "highly unusual in society at large." *Id.* (quoting *Heller*, 554 U.S. at 627). Therefore, their possession was included within the meaning of the Second Amendment's use of the word "keep." Turning to *Bruen*'s second step, the historical analysis, the Fifth Circuit questioned whether the challenged law fell within the Nation's historical tradition or outside of it. *Id.* at 454-455. In doing so, the *Rahimi* court stated:

> The Supreme Court distilled two metrics for courts to compare the Government's proffered analogues against the challenged law: *how* the challenged law burdens the right to armed self-defense, and *why* the law burdens that right.

*Id.* (emphasis added). Confirming the standard put forth in *Bruen*, the *Rahimi* court found "as to the degree of similarity required . . . [t]he core question is whether the challenged law and proffered analogue are "relevantly similar." *Id.* (citing *Bruen*, 142 S. Ct. at 2132).

6

### III. THE PARTIES' ARGUMENTS

In the instant motion, Merriman requests the Court dismiss the Indictment, finding Section 922(k) unconstitutional. (Dkt. No. 18). Merriman draws to the Court's attention a recent case from the Southern District of West Virginia, *United States v. Price*, 635 F. Supp. 3d 455 (S.D. W.VA 2022). In that case, the court found the government was unable to meet its burden of proving Section 922(k) is "consistent with the Nation's historical tradition of firearm regulation." *Price*, 635 F. Supp. 3d at 464. Therefore, Merriman requests this Court make the same finding. Specifically, Merriman argues that:

(1) Section 922(k) prohibits conduct protected by the plain text of the Second Amendment because it burdens the right of a person to possess a firearm for self-defense, and the Government cannot carry its burden to show that Section 922(k) is consistent with the Nation's historical tradition of firearm regulation; and

(2) [E]ven if Section 922(k) does not violate the Second Amendment, it exceeds Congress's powers under the Commerce Clause.

(*Id.* at 3–10). Merriman concedes the Fifth Circuit has previously rejected this second argument. (*Id.* at 10). Regarding *Bruen*'s first step, the plain text analysis, the Government argues:

Section 922(k) does not prohibit conduct protected by the Second Amendment because (1) "[w]hether a serial number is on a gun or not has nothing to do with the retention or carrying of the gun. So, the term 'keep' is surely not implicated here, nor is the term 'bear arms.' Hence, the regulation in Section 922(k) does not implicate the Second Amendment"; and (2) guns without serial numbers are not "in common use" by "law-abiding citizens" within the scope of the Second Amendment.

(Dkt. No. 22 at 4–5 and Dkt. No. 29 at 10–12). In the Government's view, *Price*'s decision holding Section 922(k) unconstitutional was wrongly decided. (Dkt. No. 22 at 5). According to the Government, the *Price* court "misconstrued the breath of the protections of the Second Amendment," and indeed "Section 922(k) may restrict one manner in which individuals may keep and carry firearms without infringing on the right to bear arms for self-defense." (*Id.* at 5-6 and Dkt. No. 29 at 10–11). The Government cites to three other district court cases rejecting the reasoning in *Price*. (Dkt. No. 22 at 6–7).[3]

Regarding *Bruen*'s second step, the historical analysis, the Government argues in the alternative that even if Merriman's conduct falls under the purview of the Second Amendment, Section 922(k) is consistent with the Nation's historical tradition of firearm regulation. (Dkt. Nos. 22 at 7 and 29 at 13). Therefore, Section 922(k) is constitutional.

To this point, the Government argues that "[t]here have been proscriptions on the commercial sale and transport of firearms since the Founding Era." (Dkt. No. 29 at 13). The Government observes "many of the colonies enacted laws regarding the registration of firearms as part of legislative schemes regarding the sale, transfer, and taxation of firearms." (*Id.* at 14). Among these laws were "a 1652 New York law [which] outlawed illegal trading of guns, gun powder, and lead by private individuals," "[a] 1631 Virginia law [which] required the recording not only of all new

---

[3] *United States v. Holton*, No. 3:21-CR-048-B, 2002 WL 16701935 (N.D. Tex. Nov. 3, 2022); *United States v. Reyna*, No. 3:21-CR-41 RLM-MGG, 2022 WL 17714376, at *5 (N.D. Ind. Dec. 15, 2022); *United States v. Tita et al*, No. CR RDB-21-0334, 2022 WL 17850250, at *7 (D. Md. Dec. 22, 2022)).

arrivals to the colony, but also 'of arms and munitions,'" a 19th century law in three southern states imposing a tax on personally held firearms, an early 17th century law in Connecticut banning residents from selling firearms outside of the colony as well as a similar ban in Virginia, and a law in "at least six colonies [which] made it a crime (with severe penalties) to sell or provide firearms or ammunition to Native Americans." (*Id.* at 14–15).

The Government also points to several states that had enacted laws "relating to the inspection and marking of gun powder, which 'was essential to the operation of firearms at that time'"; colonial and early state governments that had prohibited the manufacture and transportation of gunpowder without a license; and two states in the early republic that required the proving and marking of gun barrels and prohibited the obliteration of proof marks. (*Id.* at 15–18). According to the Government, "the historical regulations on commerce in firearms were designed to keep firearms out of the hands of those who might be dangerous" and "the laws requiring the marking of gun barrels and gunpowder were designed to protect citizens from explosions and to allow unsafe barrels or powder to be traced to the inspector who first affixed the markings." (*Id.* at 19).

Because *Bruen* only requires the Government identify a "historical analogue" and not a "historical twin," the Government argues these laws are "relevantly similar" to Section 922(k). (*Id.* at 18). As to *how* Section 922(k) burdens the right to armed self-defense, the Government asserts Section 922(k) "at most imposes a minimal burden . . . because marked firearms are ubiquitous and just as effective for

self-defense as unmarked firearms." (*Id.* at 19–20). As to *why* Section 922(k) burdens that right, the Government reports "the requirement of a serial number is an administrative measure meant to regulate commercial firearms sale, guarantee the firearm was safely manufactured, and assist in the investigation and prevention of armed criminal offenses by non-law-abiding persons." (*Id.* at 20).

## IV.   DISCUSSION

As a preliminary matter, Merriman concedes that his Commerce Clause argument is foreclosed by Fifth Circuit precedent. (*See* Dkt. No. 18 at 8–10); *see also United States v. Smith*, 2023 WL 5814936, at *2 (5th Cir. Sept. 8, 2023) (citing *United States v. Alcantar*, 733 F.3d 143, 145 (5th Cir. 2013). Therefore, the Undersigned will not address this argument any further.

The remaining question is whether Section 922(k)—the statute prohibiting an individual's possession of a firearm with a removed, obliterated, or altered serial number—is constitutional under the Second Amendment. Pursuant to the Second Amendment standard articulated by the Supreme Court in *Bruen,* and for the reasons discussed below, the Undersigned concludes that it is not.

## A. Does the Second Amendment's plain text cover Merriman's conduct?

The threshold question is whether Section 922(k) prohibits conduct that is protected by the plain text of the Second Amendment.

### 1. **"To Keep"**

The Government argues that requiring a serial number on a firearm does not implicate the term "keep" nor "bear arms," and therefore the conduct does not fall

within the scope of the Second Amendment. The Undersigned disagrees as *Rahimi*

and *Heller* foreclosed this argument. Regarding *Bruen*'s first step, the plain text

analysis, the *Rahimi* court stated:

> Rahimi's possession of a pistol and a rifle easily falls within the purview
> of the Second Amendment. The amendment grants him the right "to
> keep" firearms, and "possession" is included within the meaning of
> "keep." And it is undisputed that the types of firearms that Rahimi
> possessed are "in common use," such that they fall within the scope of
> the amendment.

*Rahimi*, 61 F.4th at 454 (internal citations removed). Further, the *Heller* Court noted

that "the American people have considered the handgun to be the quintessential self-

defense weapon . . . and a complete prohibition of their use is invalid." *Heller*, 554

U.S. at 629. Thus, like defendants Zackey Rahimi and Dick Heller, Merriman's

possession of a handgun, serialized or unserialized, falls within the purview of the

Second Amendment. The Second Amendment grants Merriman the right "to keep"

firearms, and "possession" is included within the meaning of "keep." *Rahimi*, 61 F.4th

at 454. While the Government observes that Sections 922(a)(1)(A), 922(b)(3), and

923(g) are commercial regulations on license-holders engaging in the business of

importing, manufacturing, or dealing in firearms, the same cannot be said of Section

922(k). Unlike those regulations, Section 922(k) criminalizes any person for the mere

*possession* of a firearm after a serial number has been removed, obliterated, or

altered. Therefore, contrary to the Government's position, the term "to keep" is

implicated here.

### 2. **"In Common Use"**

The Government further argues that firearms without serial numbers are not "in common use" by "law-abiding citizens" because there is no lawful reason as to why a person would prefer an unmarked firearm. (Dkt. No. 29 at 10–12). However, the possessor's intent, or circumstances in which the firearm is possessed, has no bearing on whether it is in common use.

In *Heller,* the Supreme Court held that "dangerous and unusual weapons" are not "in common use." *Heller*, 554 U.S. at 627. In support, the Supreme Court cited *O'Neill v. State*, 16 Ala. 65, 67 (1849) and *State v. Langford*, 10 N.C. 381, 383 (1824). In *O'Neill*, the Supreme Court of Alabama held, "if persons arm themselves with deadly or unusual weapons for the purpose of an affray," they may be guilty of a certain offense. *O'Neill*, 16 Ala. at 67. Similarly, in *Langford,* the Supreme Court of North Carolina held an affray may occur " . . . when a man arms himself with dangerous and unusual weapons, in such as manner as will naturally cause a terror to the people . . ." *Langford*, 10 N.C. at 383.

Thus, in evaluating whether a firearm is "dangerous and unusual," the Supreme Court in *Heller* appears to distinguish between the type of firearm and the purpose and manner of the possession, with subsequent and particular focus on the operation and functionality of the firearm. Indeed, the Supreme Court differentiated the type of lawful weapons typically possessed at home from the more "sophisticated arms," such as an M-16 selective fire machinegun, used in military service.[4] *Heller*,

---

[4] https://www.atf.gov/firearms/firearms-guide-identification-firearms-section-3

554 U.S. at 627. Selective fire weapons, like the M-16 the Court mentioned, have a switch that allows a user to choose between full or semi-automatic fire.[5] These "sophisticated arms," the Court deemed, are "highly unusual in society at large." *Id.* Handguns, on the other hand, are the "quintessential self-defense weapon," and "the most popular weapon chosen by Americans for self-defense in the home." *Id.* at 629.

Here, the Government argues that a firearm with an obliterated serial number is associated with "those weapons not typically possessed by law-abiding citizens for lawful purposes." *Id.* But the Government omits the remainder of that very same sentence, "such as short-barreled shotguns." *Id.* Short-barreled shotguns, due to the nature of their design, produce a different shot spread when fired. Given this, their functionality is different than a normal shotgun. It is notable that possession of short-barred shotguns is regulated under the National Firearms Act of 1934. 26 U.S.C. § 5845. Other regulated firearms in the Act include machineguns, short-barreled rifles, suppressors, and destructive devices. *Id.* The Undersigned does not, however, find that a firearm should or must be regulated under the National Firearms Act in order to be considered "dangerous and unusual."

In this case, Merriman possessed a handgun. The Parties both agree that there is no functional difference between a handgun and a handgun with an obliterated serial number. Although it may be true that there is no lawful reason as to why a person would prefer an unmarked firearm, the Court should focus on the type of firearm itself, and not its intended use, in determining whether the firearm is

---

[5] https://www.atf.gov/firearms/firearms-guide-identification-firearms-section-2

"dangerous and unusual." Here, the operation and firepower of a handgun with an obliterated serial number is markedly different from that of the type of weapon the Supreme Court has considered to be "dangerous and unusual."

For this reason, under the plain text analysis, a handgun with an obliterated serial number cannot be considered "dangerous and unusual." Even though handguns with an obliterated serial number may be rare, such a weapon should be considered to be "in common use," falling within the scope of the Second Amendment. Thus, the Undersigned finds that *Bruen's* first step is met, and the Second Amendment presumptively protects Merriman's right to possess a firearm with an obliterated serial number.[6]

### B. Does the Government demonstrate that Section 922(k) is consistent with the Nation's historical tradition of firearm regulation?

Under *Bruen*'s second step, the historical analysis, the Government bears the burden of demonstrating that Section 922(k) is consistent with this "Nation's historical tradition of firearm regulation." *Rahimi*, 61 F. 4th at 450. In other words, "the [G]overnment must affirmatively prove that its firearm regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Id.* Here, "the question turns on whether Section [922(k)] falls within that historical tradition, or outside of it." *Id.* at 455.

The parties dispute the standard for deciding whether the Government has affirmatively proved that Section 922(k) is consistent with the historical tradition of

---

[6] Merriman argues that the "in common use" limitation is relevant to *Bruen* Step Two, rather than Step One. The Undersigned disagrees, and in accordance with *Bruen* and *Rahimi*, places the limitation in Step One. *See Bruen*, 142 S. Ct. at 2134; *Rahimi*, 61 F. 4th at 454.

firearm regulation. Merriman argues that the Government must proffer a "distinctly similar" historical regulation "because [Section] 922(k) addresses a problem that has been around since the founding." (Dkt. No. 31 at 20). Further, Merriman argues *Rahimi* left open "the question of whether *Bruen's* 'distinctly similar' and 'relevantly similar' tests are different or one and the same." (*Id.* at 8). It appears Merriman is referencing this portion of the *Bruen* Court's opinion:

> For instance, when a challenged regulation addresses a general societal problem that has persisted since the 18th century, the lack of distinctly similar historical regulation addressing that problem is *relevant evidence* that the challenged regulation is inconsistent with the Second Amendment.

*Bruen*, 142 S. Ct. at 2132 (emphasis added). But that excerpt from *Bruen* is only providing an example of a "fairly straightforward inquiry." *Id.* at 2131. The *Bruen* Court was clear that:

> Much like we use history to determine which modern "arms" are protected by the Second Amendment, so too does history guide our consideration of modern regulations that were unimaginable at the founding. When confronting such present-day firearm regulations, this historical inquiry that courts must conduct will often involve reasoning by analogy—a commonplace task for any lawyer or judge. Like all analogical reasoning, determining whether a historical regulation is a proper analogue for a distinctly modern firearm regulation requires a determination of whether the two regulations are "*relevantly similar*."
>
> * * *
>
> While we do not now provide an exhaustive survey of the features that render regulations relevantly similar under the Second Amendment, we do think that *Heller* and *McDonald* point toward at least two metrics: *how* and *why* the regulations burden a law-abiding citizen's right to armed self-defense.

*Id.* at 2132-2133 (emphasis added). This was confirmed by the *Rahimi* Court, which held there are "two metrics for courts to compare the Government's proffered analogues against the challenged law: *how* the challenged law burdens the right to armed self-defense, and *why* the law burdens that right." *Rahimi,* 61 F.4th at 454 (emphasis added). When either the *how* or *why* are different, laws "fail on substance as analogues." *Id.* at 457. "As to the degree of similarity required . . . [t]he core question is whether the challenged law and proffered analogue are "relevantly similar." *Id.* (citing *Bruen*, 142 S. Ct. at 2132).

Here, the statute at issue states, in pertinent part:

It shall be unlawful for any person knowingly . . . to possess . . . any firearm which has had the importer's or manufacturer's serial number removed, obliterated, or altered and has, at any time, been shipped or transported in interstate or foreign commerce.

18 U.S.C. § 922(k). The Government offers potential historical analogues to Section 922(k) that fall generally into four categories: (1) laws "regarding the registration of firearms as part of legislative schemes regarding the sale, transfer, and taxation of firearms"; (2) laws "relating to the inspection and marking of gunpowder"; (3) colonial and state prohibitions on the manufacture and transportation of gunpowder; and (4) laws which required gun barrels to be "proved and marked and prohibited the obliteration of proof marks." (Dkt. No. 29 at 13-20). The Undersigned addresses each of these historical regulations in turn below.

Finally, at the hearing the parties agreed the existence of three colonial regulations isn't sufficient to form a national historical tradition. *See Bruen*, 142 S. Ct. at 2142 ("[W]e doubt that *three* colonial regulations could suffice to show a

tradition of public carry regulation."); *See also Rahimi*, 61 F.4th at 458. The Government proposed (and Merriman agreed) that, since nine states were required to ratify the Constitution and Bill of Rights at the time of their inception, there should be at least nine laws on the particular firearm regulation before it could be considered as reflective of the "Nation's historical tradition." *Id.* Understanding this, and prior to even considering whether the following laws proffered by the Government are "relevantly similar," the Undersigned notes that the Government has not referenced enough cases to meet their self-imposed burden.

### 1. Firearms Sale, Transfer, and Taxation Laws

In support of their argument that Section 922(k) is consistent with the historical tradition of firearm regulation, the Government first references laws "regarding the registration of firearms as part of legislative schemes regarding the sale, transfer, and taxation of firearms." (Dkt. No. 29 at 14). The Government cites:

> "[A] 1652 New York law outlaw[ing] illegal trading of guns, gun powder, and lead by private individuals . . . A 1631 Virginia law requir[ing] the recording not only of all new arrivals to the colony, but also 'of arms and munitions.' . . . [and] [i]n the 1800s, three southern states impos[ing] taxes on personally held firearms."

(*Id.* at 14-15). But all three of these examples are notably different from Section 922(k). The Undersigned finds regulating trade, taxes, and requiring the recording of arms and ammunition is not relevantly similar to Section 922(k)'s ban on possession. Take for instance the 1631 Virginia law, which reads:

> It is ordered and appointed, that the commanders of all the several plantations, do upon holy days exercise the men under his command, and that the commanders yearly do likewise upon the first day of December, take a muster of their men, together with the women and

17

> children, and their ages, countries, and towns, where they were born, with the ships they came in, and year of the Lord, as also of arms and munition . . .

Virginia Act of Feb. 27, 1631, Act LVI, reprinted in I Henning, supra note 103, at 174-75. While the parties are ostensibly in agreement that "the '*why*' of this Virginia law might be analogous to 922(k)," the Undersigned is doubtful.[7] (Dkt. No. 31 at 24). But, hypothetically, even if the 1631 Virginia law's *why* might be similar to Section 922(k), *how* these regulations burden a law-abiding citizen's right to armed self-defense is undoubtedly different.

While "not an exact analogy to §922(k)," the Government further puts forth several early 17th century laws, ordinances, and statutes demonstrating:

> Connecticut banned residents from selling firearms outside the colony . . . Virginia likewise provided that people were "at liberty to sell armes and ammunition to any of his majesties loyall subjects *inhabiting this colony* . . . [and] at least six colonies made it a crime (with severe penalties) to sell or provide firearms and ammunition to Native Americans.

(Dkt. No. 29 at 15). The Government argues "these laws show that colonial legislatures were concerned about the movement of firearms between private parties and the dangers of firearms falling into the wrong hands." *Id.* However, the Fifth Circuit held in *Rahimi* that "Laws that disarm slaves, Native Americans, and disloyal people may well have been targeted at groups excluded from the political community – i.e., written out of 'the people' altogether – as much as they were about curtailing violence or ensuring the security of the state. Their utility as historical analogues is

---

[7] Both the Government and Merriman cite *United States v. Holton*, 639 F.Supp.3d 704 (N.D. Tex., 2022) (suggesting that the purpose of this Virginia law was to "control[] and trac[e] the sale of firearms").

therefore dubious, at best." *Rahimi,* 61 F.4th at 457. Thus, the Undersigned finds these laws, to the extent that the offered examples are indeed laws, fail to meet the "relevantly similar" standard.

### 2. Gunpowder Inspection and Marking Laws

The Government further argues that laws relating to the inspection and marking of gunpowder affected the ability of gun owners to use firearms for self-defense. (Dkt. No. 29 at 15). However as noted by Merriman, both the *how* and *why* are different than that of Section 922(k) because any marking on powder containers was simply manufacturer-specific and was done primarily for the purpose of ensuring a safe product. (Dkt. No. 31 at 25-27). Further, the penalty for violating one of these laws was merely a fine, versus any term of imprisonment. *Id*. These laws fail to meet the "relevantly similar" standard.

### 3. Gunpowder Manufacture and Transportation Laws

The Government references specific gunpowder manufacturer and transportation laws. (Dkt. No. 29 at 16). However as Merriman points out, both the *how* and *why* are different because the laws were not aimed at banning the possession of gunpowder by the citizen gun owner herself. (Dkt. No. 31 at 25-27). Further, the penalty for violating such laws was merely a fine. *Id*. These laws fail to meet the "relevantly similar" standard.

### 4. Barrel-Proofing Laws

The Government's final argument is that two states' barrel-proofing laws serve as analogues. (Dkt. No. 29 at 17-18). However, as both parties largely agree, the

purpose of these laws was to ensure the safety and integrity of the firearm barrel during operation, not to prevent or track crime. (*Id*. and Dkt. No. 31 at 27-29). Further, the penalty for violating one of these laws was a fine. (Dkt. No. 31 at 29). These laws fail to meet the "relevantly similar" standard.

In light of the above, and pursuant *Bruen*'s second step*,* the Government has not met their burden of demonstrating that Section 922(k) is consistent with this "Nation's historical tradition of firearm regulation."

## V.   RECOMMENDATIONS

It is **RECOMMENDED** that the District Court **ACCEPT** the Undersigned's finding that *Bruen'*s first step is met, and the Second Amendment presumptively protects Merriman's right to possess a firearm with an obliterated serial number.

It is **RECOMMENDED** that the District Court **ACCEPT** the Undersigned's finding that under step two of *Bruen,* the Government has not met their burden of demonstrating that Section 922(k) is consistent with this "Nation's historical tradition of firearm regulation."

It is **RECOMMEND** that the District Court **GRANT** Merriman's Motion to Dismiss Indictment. (Dkt. No. 18).

## VI.   WARNINGS

The parties may file objections to this Report and Recommendation, unless they waive the right to do so. A party filing objections must specifically identify those findings or recommendations to which objections are being made. The District Court need not consider frivolous, conclusive, or general objections. *Battle v. U.S. Parole*

*Comm'n*, 834 F.2d 419, 421 (5th Cir. 1987) (quoting *Nettles v. Wainwright*, 677 F.2d 404, 410 n.8 (5th Cir. 1982) (en banc)).

A party's failure to file written objections to the proposed findings and recommendations contained in this Report within fourteen (14) days after being served with a copy of the Report—or the party's waiver of the right to do so—shall bar that party from *de novo* review by the District Court of the proposed findings and recommendations and, except upon grounds of plain error, shall bar the party from appellate review of proposed factual findings and legal conclusions accepted by the District Court to which no objections were filed. *See* 28 U.S.C. § 636(b)(1); *Thomas v. Arn,* 474 U.S. 140, 150–53 (1985); *Douglass v. United Services Auto. Ass'n,* 79 F.3d 1415, 1428–29 (5th Cir. 1996) (en banc).

The Clerk is directed to send a copy of this Report and Recommendation to all parties.

SIGNED this 16th day of October, 2023.


CHRISTOPHER DOS SANTOS
UNITED STATES MAGISTRATE JUDGE