IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF TEXAS

LAREDO DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| V. | § | CR. NO. L-22-01439 |
| MARSHALL STEVE MERRIMAN | § | |

**OBJECTION TO THE UNITED STATES MAGISTRATE'S REPORT AND RECOMMENDATION AND RESPONSE TO THE GOVERNMENT'S OBJECTION**

On October 16, 2023, the U.S. Magistrate Judge concluded that 18 U.S.C. § 922(k)—which criminalizes the possession of a firearm with a removed or altered serial number—violates the Second Amendment. In this combined objection and response to the government's objection, Mr. Merriman explains why the heart of the magistrate judge's Report & Recommendation ("Report") is correct. Mr. Merriman also discusses the few areas in which that decision went awry in order to preserve his arguments about them. *See, e.g.*, *Owens v. Stalder*, 638 F. App'x 277, 281 (5th Cir. 2016) (unpublished) (Plain error review applies when a party did not object to the R&R "even where a party's failure to object can 'presumably' be traced to the fact that the report and recommendation ultimately favors that party"). Finally, he re-raises his commerce clause argument as well in order to preserve it for further review.

ARGUMENT

1. **Section 922(k) violates the Second Amendment**

As the Report recognized, the Supreme Court's decision in *New York State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111 (2022), established the governing Second Amendment analysis. *See* Report 4-5, Dkt, 46. It asks, first, whether the regulated conduct is covered by the "plain text" of the Second Amendment. *Id.* at 2129-30, 2134-35. If the answer is yes, the burden shifts to the

1

government to prove that the challenged law is consistent with this country's national tradition of firearm regulation. *See id.* at 2126, 1230. If the government cannot satisfy its burden, the restriction is unconstitutional. *See id.*

The Report correctly concludes that § 922(k) prohibits conduct covered by the Second Amendment's plain text and that the government has failed to point to an analogous historical tradition of regulation. This objection and response addresses both arguments in turn.

### a. The conduct prohibited by § 922(k) is covered by the text of the Second Amendment.

The Report's plain text analysis proceeds in two steps. First, it includes that the word "keep" covers conduct prohibited by the Second Amendment—namely the possession of handguns.[1] Report 10-11. Second, the report concludes that unserialized firearms are "in common use." Report 12-14. The Report incorrectly places this question at *Bruen*'s first step rather than its second. Report 14 n.6. But the Report correctly holds that the "in common use" standard is about whether the firearm has dangerous and unusual functional features and that unserialized firearms do not meet that standard. Report 12-14.

**To keep:** The Second Amendment grants a defendant the "right 'to keep' firearms and 'possession is included within the meaning of 'keep.'" Report at 11 (quoting *Rahimi*, 61 F.4th at 45). "Section 922(k) criminalizes any person for the mere *possession* of a firearm after a serial number has been removed, obliterated, or altered. Therefore, . . . the term "to keep" is implicated here." Report at 11.

---

[1] The Report also correctly concluded that 922(k) is not a commercial regulation. *See* Report 11 (explain that, unlike several other sections of 922 and 923, 922(k) is not a commercial regulation because it prohibits mere possession). Because the government does not re-raise this argument in its briefing, it has failed to preserve it for this Court's review.

2

**In common use:**  The Report also correctly concludes that an unserialized firearm is an "arm" within the meaning of the Second Amendment.  Report 12-14.  "18th-century meaning" of the term "arms" is "no different from the meaning today." *District of Columbia v. Heller*, 554 U.S. 570, 581 (2008).  Then, as now, the term generally referred to "[w]eapons of offence, or armour of defence." *Id.* (cleaned up).  "All relevant sources of the original public meaning of 'arms' agreed that "all firearms constituted 'arms'" within the . . . meaning of that term." *Teter v. Lopez*, No. 20-15948, 2023 WL 5008203, *4 (9th Cir. Aug. 7, 2023) (quoting *Heller*, 554 U.S. at 581).  Unserialized firearms, accordingly, fall within the plain text of the word "arms" in the Second Amendment.

The government attempts to graft onto the text of the Second Amendment a new test: whether the firearm is in "common use."  However, this test has no bearing in the text of the Second Amendment.  Instead, it is relevant to the "historical tradition of prohibiting the carrying of dangerous and unusual weapons.'" *Teter*, 2023 WL 5008203, at *8.  *Heller* itself noted this country's tradition of prohibiting dangerous and usual weapons, but "[i]t did not say that [such] weapons are not *arms*." *Id.* (emphasis in original).  Therefore, government bears the burden to prove that unserialized firearms are dangerous and unusual at *Bruen*'s second step, rather than its first.  *Id.*

The Report gets this wrong, incorrectly concluding that the "in common use" test is relevant at step one.  Report 14 n.6.  Nevertheless, the rest of the Report's discussion of the "in common use" test is spot on.  "In *Heller*," the Report explains "the Supreme Court held that 'dangerous and unusual weapons' are not 'in common use.'" Report at 12 (quoting *Heller*, 554 U.S. at 627).  In particular, *Heller*—relying on state court case law from before the Civil War— "appears to distinguish between the type of firearm and the purpose and manner of the possession

3

. . . [with] particular focus on the *operation and functionality of the firearm*." Report at 12 (emphasis added); *see also, e.g.*, *Bruen*, 142 S. Ct. at 2139-47 (discussing long history of these laws and their focus on the types of weapons (lance, armor, short pistol) and manner of carry that would terrify the public).

Indeed, *Heller* offered specific examples of dangerous and unusual weapons: M-16 rifles, short-barreled shot guns, and arms that are "useful against modern-day bombers and tanks." *Heller*, 554 U.S. at 625, 627; *see also* Report at 12-13. These firearms are dangerous to due to their functional features. M-16 rifles "allow[] a user to choose between full or semi-automatic fire" and short-barrel shot guns "produce a different shot spread when fired." Report 13.

In contrast, there is no functional difference between a serialized and unserialized firearm. Report 13-14 (noting that this is undisputed). Therefore, the Report correctly concluded that unserialized firearms are in common use. *Id.*

The government has argued, instead, that unserialized firearms are not in common use because, *after* Congress made possessing unserialized firearms illegal, law-abiding people don't possess them. For avoidance of doubt, Mr. Merriman agrees with the Report's conclusion that whether law abiding citizens use unserialized firearms is irrelevant to the question of whether that firearm is in common use. The historical grounding for the common use test, as discussed, is whether it is dangerous.

Furthermore, it is undisputed that law abiding citizens at the founding used unserialized firearms. Indeed, the government has never suggested that unserialized firearms were not commonly used by law abiding citizens until *after* unserialized firearms were made illegal. *Cf. Teter*, 2023 WL 5008203, at *9 (considering government's argument that butterfly knives could

4

be outlawed because they were used by non-law-abiding citizens (gangs) *before* the government outlawed them).

Instead, the government argues that *today* unserialized firearms are not used by law abiding citizens. But it has failed to carry its burden to prove that this is correct as a factual matter. *Cf. Teter*, 2023 WL 5008203, at *9 (concluding the government had failed to meet its burden to prove that the weapon outlawed—butterfly knives—were not commonly used by law abiding citizens). Plus, more fundamentally, this argument is circular (people who follow the law don't have these guns because they are illegal) and does not make sense as the proper legal test.

It fails to answer the operative legal question: whether the government could prohibit such firearms at the time it made them illegal. *Bruen*, it bears emphasizing, was a decision foregrounding originalism and the intent and understanding of the founding founders. It defies logic to think that decision is properly understood to ossify firearm regulation to whatever happened to be legal in 2022, because law abiding people in 2022 do not do what is illegal in 2022.

**Infringing:** In its objection to the Report, the government asserts that § 922(k) does not infringe on Mr. Merriman's Second Amendment rights because he can still possess other firearms. The Report rightly did not adopt this argument.

As explained in Mr. Merriman's earlier briefing, "[i]t is no answer" under the Second Amendment "to say . . . that it is permissible to ban the possession of [one type of gun] so long as the possession of other firearms [] is allowed." *Heller*, 554 U.S. at 629. "[T]he infringement on a constitutional right in one way is not typically negated by the fact that the Government did not violate the same right even further in another way." *United States v. Kelly*, 2022 WL 17336578, at *3 (M.D. Tenn. 2022). "We would never say the police may seize and keep printing presses so long as newspapers may replace them, or that they may seize and keep synagogues so long as

5

worshippers may pray elsewhere." *Frein v. Pennsylvania State Police*, 47 F.4th 247, 250 (3d Cir. 2022) (rejecting government's argument that seizure of parents of murder convict's guns did not violate the Second Amendment because they could retain or acquire other firearms).

Indeed, several district court judges in California have held that "the fact that Californians may purchase other firearms—including long guns or single-shot guns . . . , outdated [] handguns, or [state-of-the-art] handguns on the secondary market—does not mean that the Second Amendment does not cover their proposed conduct of purchasing state-of-the-art handguns on the primary market." *Boland v. Bonta*, No. SACV2201421CJCADSX, 2023 WL 2588565, at *6 (C.D. Cal. Mar. 20, 2023); *see also Renna v. Bonta*, No. 20-CV-2190-DMS-DEB, 2023 WL 2846937, at *7 n.8 (S.D. Cal. Apr. 3, 2023*)*. Same here. The fact that individuals can possess serialized firearms does not mean that the Second Amendment does not cover their conduct in possessing unserialized ones. After all, the Second Amendment's text says nothing about serial numbers—only keeping arms.

    **b. The Government fails to meet its burden to prove that § 922(k) is justified by an analogous tradition of firearm regulation.**

The Report correctly concludes that the government has failed to point to a sufficiently analogous and robust tradition of historical regulation to justify § 922(k). Report 14-20. However, at the threshold, the Report gets the governing legal standard wrong.

As noted in Mr. Merriman's supplemental brief, *Bruen* set out two conceptual pathways by which the government's historical evidence can be evaluated at *Bruen* Step Two, but the Fifth Circuit's opinion in *Rahimi* muddied the doctrinal waters by eliding the difference between them. *See* Merriman Supp. Br. 8-9, Dkt. 31 (May 12, 2023). The Circuit's decision in *United States v.*

*Daniels*, 77 F.4th 337 (5th Cir. 2023), reaffirms the doctrinal difference.[2] If the problem addressed by a challenged law is "a general societal problem that has persisted since the 18th century," the government must point to "distinctly similar" historical regulation. *Daniels*, 77 F.4th at 342. If the problem is novel, however, the government need only point to "relevantly similar" regulation. *Id.*

As explained in Mr. Merriman's briefing, the "distinctly similar" test applies here because tracking firearms and solving gun crime were problems that existed at the founding and the technology to stamp firearms existed then too. *See* Merriman Supp. Br. 20-23. Even the district courts that have refused to strike down § 922(k) have recognized that the founders were concerned with "illegal trading and trafficking of arms and ammunition" and "controlling and tracing the sale of firearms." *E.g.*, *United States v. Holton*, 639 F. Supp. 3d 704, 711-12 (N.D. Tex. 2022). And because the government addressed the same problem by different means, § 922(k) must fall under the "distinctly similar" standard. *See* Merriman Supp. Br. at 23; *see also Holton*, 639 F. Supp. 3d at 711-12 (noting that historical regulations that "addressed similar goals" were "effected by different means").

In any event, the Report correctly concludes that Mr. Merriman prevails under even the "relevantly similar" test. The government conceded at oral argument before the Magistrate Judge that at least nine states/colonies need to have passed laws on a particular category of firearm regulation before it can establish a historical tradition of firearm regulation, because that was the number of states required to ratify the Bill of Rights. Report at 17.[3] The government, as the

---

[2] Mr. Merriman brought this case to the Court's attention in a notice of supplemental authority. *See* Notice, Dkt. 40 (August 16, 2023).
[3] Mr. Merriman agreed that at least two-thirds of states are needed to establish a historical tradition. At the time of the founding—which is the proper point of reference in federal cases, *see Daniels*, 77 F.4th at 348 (holding that "the meaning of the Second Amendment. . . was fixed when it first

7

Report correctly notes, has not referenced enough examples of any category of historical regulation to meet this burden. *Id.*

Furthermore, even if the government had established a robust tradition, the laws it relies on are not sufficiently analogous to § 922(k). The Report correctly and methodically distinguished several categories of laws relied on by the government: laws governing firearm taxation, sale, and transfer; gunpowder laws; and barrel-proofing laws.

**Firearm taxation, sale, and transfer:** Laws governing firearm taxation, sale, and transfer are very different from § 922(k)'s ban on possessing unserialized firearms. The purpose of taxation is typically revenue generation, while the purpose of § 922(k) is to trace lost firearms and solve crimes. *Cf. United States v. Daniels*, 77 F.4th 337, 346 (5th Cir. 2023) (rejecting as inapposite historical laws that did not share the same purpose as the challenged regulation). Plus, taxing firearms is a far cry from banning them. *Cf., e.g.*, *Daniels*, 77 F.4th at 345 (rejecting as inapposite laws that did not ban gun possession or carry). Thus, laws taxing firearms at the founding are not "relevantly similar" to § 922(k) in either the "how" or the "why."

Similarly, laws requiring the recording the firearms of new arrivals to a colony and laws prohibiting the sale of firearms outside a colony are very different from § 922(k). Requiring someone to record their possession of a firearm or banning its sale outside the jurisdiction is not the same thing as banning its possession entirely. Furthermore, these historical laws targeted a more limited class of people (those outside the colony) than § 922(k) (everyone). *Cf. United States v. Daniels*, 77 F.4th 337, 346 (5th Cir. 2023) (distinguishing laws governing militia men from user-in-possession laws by noting, among other things, that "the limitations applied only to the militia"

---

applied to the federal government in 1791")—that is nine states. If the government were to rely on more recent law after additional states had joined the Union, the number of regulations needed to establish a tradition would be higher.

8

and so say "little about the limits acceptable for the general public"). Accordingly, they are inapposite.

Finally, "[l]aws that disarm slaves, Native Americans, and disloyal people may well have been targeted at groups excluded from the political community—i.e., written out of 'the people' altogether—as much as they were about curtailing violence or ensuring the security of the state. Their utility as historical analogues is therefore dubious at best." *Rahimi*, 61 F.4th at 457. Equally important, they bear essentially no relationship to 922(k). They are restrictions on sale, not possession. And the purpose of these laws was "the preservation of political and social order" and the prevention of "armed rebellion," *Rahimi*, 61 F.4th at 457, not to trace lost firearms and solve gun crimes, *see* Gov. Supp Br. 19. Thus, such laws are not relevantly similar.

**Gunpowder laws:** Gunpowder manufacturer, inspection, transportation and marking laws are not relevantly similar to § 922(k) either. Report at 19. Laws governing manufacture and transportation were not aimed at banning the possession of gunpowder by the citizen herself. *Id.* And laws requiring the marking of inspected gunpowder containers were manufacturer-specific and done for the purpose of ensuring consumer safety. *Id.* Indeed, the government itself has conceded that such laws were "designed to protect citizens from explosions" and "to allow unsafe . . . powder to be traced to the inspector who first affixed the markings." Gov. Supp. Br. 19. Section 922(k), on the other hand, requires marking and serialization procedures to "allow[] authorities to recover stolen firearms and trace firearms that have been used in a crime." *Id.* The "why" of these laws are, accordingly, very different. Furthermore, the penalty for violating these gunpowder laws is a fine, while the penalty for violating § 922(k) is a felony conviction and up to five years imprisonment. *See* 18 U.S.C. § 924(a)(1)(B); Report at 19. Many of these laws do not even appear to apply to the consumer herself. The laws, therefore, are not relevantly similar.

9

**Barrel-proofing laws**:  Finally, barrel proofing laws are not relevantly similarly either. "Barrel proofing" was a type of musket and pistol barrel-function testing where appropriate-sized ammunition was overloaded with powder in the gun to see if the firearm could withstand the increased pressures from an overloaded discharge.  *See* Merriman Supp Br. 28 & n.13.  "The purposes of these laws was to ensure the safety and integrity of the firearm barrel during operation, not to prevent or track crime."  *See* Report at 20 (citing Gov. Supp. Br. at 17-18; Merriman Supp Br. at 29).  The penalty for violating these laws is also a fine, not prison-time.  *Id.*  Therefore, the laws are not relevantly similar either.

In sum, the government has failed to point to any relevantly similar firearm regulations. In its objection, the government makes no concrete arguments against this conclusion, preferring instead to cite district court decisions that have gone the other way.  But legal adjudication is not a game of nose non-precedential counting.  The cases relied on by the government are not binding, nor are they persuasive.

In *United States v. Sharkey*, No. 422CR00176SMRHCA1, 2023 WL 6139615, at *3 (S.D. Iowa Sept. 20, 2023), for example, the district court agreed that laws mandating the marking of gun barrels and gunpowder were "primarily crafted with the intention of safeguarding citizens from potential explosions," while 922(k) was designed to help "recover stolen firearms and trace those that have been implicated in criminal activities."  *Id.*  Nevertheless, it held that those were "comparabl[e]" and served "similar objectives."  *Id.*  That conclusion defies logic.  Laws about product safety and laws about crime solving simply do not have the same "why," and therefore are not relevantly similar.[4]

---

[4] This decision also overlooks the fact that two laws are not enough to establish a tradition of historical regulation.

10

*United States v. Dangleben*, No. 3:23-MJ-0044, 2023 WL 6441977, at *8 (D.V.I. Oct. 3, 2023), for its part, finds an analogous historical tradition to § 922(k) by relying on colonial muster, registration, and census laws that tracked the ownership of firearms in colonial America. But this is wrong. There do not appear to have been enough of these laws at the founding to establish a historical tradition. Furthermore, these laws seem targeted at ensuring that the colonies had an understanding of the armaments'—and thus associated military readiness—of their militias (for the most part), not targeted at solving of gun crime. The why, accordingly, is different. Finally and most importantly, these laws plainly have a different "how" to § 922(k)'s limitation on possessing and receiving firearms without serial numbers.

The other cases relied on by the government are similarly erroneously reasoned. The government has failed to meet its burden at *Bruen*'s second step, and § 922(k) is unconstitutional.

**2. Mr. Merriman re-raises his Commerce Clause argument in order to preserve it for further review.**

Mr. Merriman believes that § 922(k) is an unconstitutional exercise of the federal government's commerce clause powers because it prohibits even noncommercial receipt and possession of firearms so long as at some point in the firearm's distant past it crossed a state or international boundary (possibly before its serial number was ever removed). This understanding of the Commerce Clause—that Congress has the power to regulate the possession or non-commercial receipt of any item that ever traveled in interstate commerce—is inconsistent with opinions of the Chief Justice and the four dissenting justices in *Nat'l Fed'n of Indep. Bus. v. Sebelius (NFIB)*, 567 U.S. 519, 558 (Roberts, C.J.) & 649 (Scalia, Kennedy, Thomas, Alito, JJ., dissenting) (2012). He re-raises this argument in order to preserve it for further review.

## CONCLUSION

For the foregoing reasons, Mr. Merriman respectfully requests that the single count indictment against him be dismissed.

The government has asked, as an alternative to denying Mr. Merriman's motion, that this Court hold his motion "in abeyance pending further guidance from the Circuit Courts of Appeals and/or the Supreme Court of the United States." It fails to mention what additional case law it expects to shed greater light on this important but niche question and when it expects it to be decided. Mr. Merriman's motion to dismiss has been pending for nearly a year, and he is not aware of this issue pending before the Fifth Circuit at this time. Indeed, in the one case counsel is aware of having gone against Mr. Merriman in this Circuit—*United States v. Holton*, 3:21-CR-0482, 2022 WL 16701935 (N.D. Tex. Nov. 3, 2022)—the government recently dismissed all but one charge and the defendant received a sentence of probation that he did not appeal. Serious fairness concerns are raised by any further delay in Mr. Merriman's case.

Respectfully submitted,

MARJORIE A. MEYERS

Federal Public Defender
Southern District of Texas
Texas State Bar Number 14-003750
Southern District of Texas No. 3233

By /s/ Carlos M. Alaniz
CARLOS M. ALANIZ
Assistant Federal Public Defender
Texas State Bar No. 24009081
Southern District of Texas No. 27460
1202 Houston St.
Laredo, Texas 78041
Telephone: 956/753-5313
Fax:     956/753-5317

/s/ Courtney L. Millian
COURNTEY L. MILLIAN
Assistant Federal Public Defender
Washington D.C. Bar ID No. 1659911
Southern District of Texas No. 3785141
Attorney for Defendant
625 Indiana Avenue, N.W.
Washington, D.C. 20004
(202) 208-7500

## CERTIFICATE OF SERVICE

I, Carlos M. Alaniz, certify that on this the 13th day of November, 2023, a copy of the foregoing Motion to Extend the Deadline was served by Notification of Electronic Filing and was delivered via email to the office of the United States Attorney in Laredo, Texas.

/s/ Carlos M. Alaniz
Carlos M. Alaniz
Assistant Federal Public Defender